[No. 31897. Department One. June 12, 1952.]

R. H. EVANS, *Respondent*, v. CONTINENTAL CASUALTY COMPANY, *Appellant*.[1]

[1]Reported in 245 P. (2d) 470.

*Skeel, McKelvy, Henke, Evenson & Uhlmann* and *Altha P. Curry,* for appellant.

*Lycette, Diamond & Sylvester* and *Earle W. Zinn,* for respondent.

DONWORTH, J.—This action was brought by plaintiff, who was an insured under a public liability insurance policy issued by defendant, to recover the sum of $9,250 paid by him in compromise of two damage actions brought against him, together with his expenses and attorney fees incurred in connection with compromise of the two suits.

The case was tried before the court sitting with a jury, but, at the close of the testimony, the court, with the consent of the parties, withdrew the case from the jury and entered findings of fact and conclusions of law upon which it rendered judgment for plaintiff in the total sum of $10,080.11. Defendant has appealed from this judgment.

The factual background of this controversy is somewhat complex, although there is little dispute between the parties as to the controlling facts. At the trial and in their briefs in this court, both parties argued only questions of law.

Appellant is a casualty insurance company authorized to do business in this state, having its home office in Chicago. Respondent has for many years operated a drive-yourself automobile rental business in Seattle as a licensee of the Hertz Drivurself system.

Appellant, prior to the time this controversy arose, had issued a policy of liability insurance designated "Hertz Special Automobile Policy (Licensee form)" under which respondent was an insured licensee. This policy, which was in force when the events hereinafter described took place, provided in part as follows:

"*Coverage A—Bodily Injury Liability.* To pay on behalf of the Assured all sums which the Assured shall become obligated to pay by reason of the liability imposed upon the Assured by law for damages, including damages for care and for loss of services, because of bodily injury, including

death at any time resulting therefrom, sustained by any person or persons, caused by accident during the policy period and arising out of the ownership, maintenance or use, including loading or unloading, of any of the automobiles described in the Schedule.

"[Here follow similar provisions relating to liability for property damage.]

"*Service.* The Company agrees to investigate all reported accidents covered hereby; to defend for the Assured any suits, even if groundless, brought against the Assured to recover damages for which indemnity is payable under this policy, unless the Company shall elect to effect settlement thereof; to pay irrespective of the limits of liability hereinafter mentioned all expenses incurred by the Company for investigation and defense, including all costs taxed against the Assured in such suits, and all interest accruing after entry of judgment until the Company shall have paid, tendered or deposited in court such part of such judgment as · does not exceed the limit of the Company's liability thereon, all expense necessarily paid in money by the Assured at the time of the accident in removing injured person to a suitable place, and such expense so paid for such immediate medical and surgical aid as the Assured may then deem imperative. . . . ·

"This insurance is subject to the following conditions and failure on the part of the Assured to comply therewith shall forfeit the right of said Assured or of any judgment creditor of said Assured to recover hereunder. . . .

"2. Upon the occurrence of any accident covered by this policy, the Renter or Driver shall give immediate notice to the Licensee from which such automobile was rented and immediately thereafter the Licensee shall give written notice to the Company at its General Office, 910 South Michigan Avenue, Chicago, Illinois, or to an authorized agent or Branch Office of the Company within the state wherein such accident occurred, with the fullest details possessed at the time by the Licensee, and each Assured shall immediately forward to the Company or to such authorized agent or Branch Office as soon as practicable every process, pleading or paper of any kind relating to any and all claims, suits and proceedings received by such Assured. The Company shall have the exclusive right to contest or settle any of said claims or suits. The Assured shall not, except at its own cost, voluntarily make any payment, assume any obligation or incur any expense other than as herein elsewhere pro-

vided for without the written consent of the Company. The Assured shall not interfere in any way respecting any negotiations for the settlement of any claim or suit nor in the conduct of any legal proceeding nor in any manner aid or abet any claimant, but shall co-operate fully with the Company in the defense of said claim or suit and shall, upon the Company's request, attend hearings and trials and assist in effecting settlement, securing and giving evidence and obtaining the attendance of witnesses and the Company shall reimburse the Assured for any expense, other than for loss of time, incurred at the Company's request."

The clauses in the policy upon which appellant relies as relieving it of liability under the circumstances later related herein, were stated as follows:

"3. This policy does not cover:  . . .

"(d)  Any liability of the Licensee:  . . .

" (3)  as to any automobile leased or rented by a Licensee to any person (a) in violation of law as to age or under the age of sixteen years in any event; (b) under the influence of intoxicating liquors or narcotics;  . . .

" (6)  No action shall be maintained against the Company under this policy unless brought after the amount of loss shall have been finally determined either by judgment against the Assured after actual trial or by written agreement of the Assured, the Claimant and the Company. . . ."

The limits of appellant's liability as set forth in the policy were five thousand dollars for personal injuries sustained by each person and ten thousand dollars for such injuries sustained by more than one person in any one accident and one thousand dollars for property damage.

On August 28, 1947, one of respondent's employees rented an automobile to one De Marco, a merchant seaman then seventeen years old (who represented himself as being twenty-one). He was accompanied by a young man (later identified as James Hubert) who appeared to be about the same age. When De Marco first applied for an automobile, respondent's wife refused to rent to him because, as she testified, she didn't like his appearance and thought she detected a faint odor of beer. She told De Marco that they had no car available. She testified positively that he was

not under the influence of intoxicating liquor at that time. Appellant at the trial took the position that it was immaterial in this case whether De Marco was under the influence of liquor at that time.

About half an hour after being turned down by Mrs. Evans, De Marco reappeared and obtained a car from an employee of respondent who did not know of the previous refusal. The latter testified that there was no indication then that De Marco had been drinking.

On the following day, between six and seven o'clock p. m., De Marco brought the car into another place of business operated by respondent to obtain gasoline and oil and pick up a tire that was being repaired. The employee who saw him at that time testified that De Marco did not appear to have been drinking.

About 2:30 a. m. August 30th, De Marco, accompanied by James Hubert, while driving west down a steep hill on Madison street in Seattle at a high rate of speed, disregarded a stop light at the corner of 4th and Madison streets and collided violently with an automobile owned and driven by Arthur Alton Smith, who was traveling south on 4th avenue. As a result of this collision, Smith was killed and Miss Iladen Filer, a passenger in his car, sustained extremely serious personal injuries.

De Marco and Hubert ran away from the scene but later surrendered themselves at the police station. De Marco subsequently pleaded guilty to the crime of negligent homicide by means of a motor vehicle, and Hubert pleaded guilty to aiding and abetting him.

When the accident was reported to respondent on August 30th, he immediately notified appellant thereof and it began an investigation of the accident and the facts relating thereto. An adjuster for appellant, who interviewed witnesses and parties involved in the accident and took statements from them and from respondent's employees, found evidence indicating that De Marco was under the influence of intoxicants at the time of the accident. Shortly after the accident, appellant gave De Marco notice that it asserted

a reservation of its right to disclaim coverage as to him. This was done pursuant to another provision in the policy that it did not cover a renter who operated the automobile while under the influence of intoxicants.

No suit was filed against respondent or De Marco as a result of the accident until December 29, 1948, when respondent was served with summons and complaint in an action brought against him and De Marco in the superior court for King county by the administrator of the estate of Arthur Alton Smith, the deceased owner and operator of the other car involved in the accident. The plaintiff in that action prayed for judgment in the sum of $25,976.29 (later amended to $32,176.29) for the wrongful death of Smith and damages to his automobile. The complaint contained the following allegations in reference to respondent's negligence:

"That the negligence of the defendant, R. H. Evans, and/or his agents or employees, consisted of failure to exercise due care in the rental of a vehicle; renting a vehicle to the said Donald De Marco who was in an obviously intoxicated condition; continuing said rental agreement with the said Donald De Marco for a period after the said R. H. Evans knew or should have known that the said Donald De Marco was in an intoxicated condition; renting a vehicle equipped with defective brakes; failure to exercise due care under the circumstances presented to said defendant R. H. Evans; renting a car to a minor, and renting a car to a minor with liquor in his possession."

Respondent immediately turned the summons and complaint over to appellant. It assumed the defense of the action, and its attorneys prepared, on respondent's behalf, an answer which was verified before a notary public in the office of appellant's attorneys. This answer was signed both by respondent's attorneys and by appellant's attorneys appearing jointly for respondent. About a month previous to the filing of this answer, appellant by letter to respondent had indicated its willingness to have respondent's attorneys assist in the defense of this action at respondent's expense, since the amount sued for was greatly in excess of the coverage provided by the policy.

On July 15, 1949, respondent was served with summons and complaint in an action brought against him and De Marco by Miss Filer, the injured woman, to recover $55,223.30 for personal injuries and special damages. Respondent immediately turned that complaint over to appellant, and it assumed the defense of that action. On respondent's behalf, its attorneys prepared an answer which was verified by one of them. Pursuant to appellant's invitation, respondent's attorneys signed this answer jointly with appellant's attorneys because of the excess liability over the policy coverage.

On February 8, 1949, appellant wrote respondent with reference to the first case and again on August 15, 1949, wrote with reference to the Filer case claiming a reservation of rights.

The two letters were practically identical. In each, appellant commented upon the fact that the complaints in both tort cases alleged that, at the time De Marco rented the car from respondent, De Marco was in an intoxicated condition, plainly visible to any individual exercising due care to ascertain his condition, and further alleged that De Marco was intoxicated when he extended his rental period on the car. The letters then referred to the exclusion provisions in the liability policy hereinbefore quoted as follows:

"3. This policy does not cover: . . .

"(d) Any liability of the Licensee: . . .

"(3) as to any automobile leased or rented by a Licensee to any person (a) in violation of law as to age or under the age of sixteen years in any event; (b) under the influence of intoxicating liquors or narcotics; . . ."

The letters further stated that, relying upon the statements of respondent and his employees that De Marco was not intoxicated at the time of his rental of the car, or the extension thereof, appellant would proceed with the defense of the suits, but, if upon the trial of the case it was established that De Marco was under the influence of intoxicating liquor at the time the rental was made or extended, then appellant would disclaim coverage and withdraw from the further defense of the action.

After receiving the reservation of rights letters of February 8th and August 15th, respondent orally demanded that appellant elect either to undertake the defense of the two tort actions without reservation and accept full liability up to its policy limits for any judgment that might be rendered *or* to withdraw entirely from the defense of the cases and relinquish the control of the defense thereof to respondent and his attorneys, but at appellant's risk and expense. Appellant refused to comply with these oral demands.

During this time, respondent's attorneys took the initiative in an effort to effect settlement of the tort actions and secured information from the attorneys for plaintiffs therein which indicated that both suits could be settled for a sum between eight thousand dollars and ten thousand dollars. Respondent offered to contribute two thousand dollars (which he later increased to four thousand dollars) toward a settlement of the two cases and urged appellant to contribute the balance of approximately six thousand dollars in order that they might be settled. Appellant refused to do so, but made no offers of its own toward effecting a settlement.

Appellant's reluctance to discuss settlement and its unco-operative attitude were explained at the trial of this action when respondent obtained from appellant and put in evidence a letter written from its home office to its Seattle claims agent on August 11, 1949. This letter, of which respondent was unaware until he discovered it during the trial, read in part as follows:

"We note also that our attorney has been in conference with Evans' personal attorney and Evans is willing to contribute $2000.00 toward a possible $8000 settlement of these two cases. It is your opinion that we should seriously evaluate these cases now while Evans is in the mood to contribute toward settlement.

"We are not inclined to place any value on the cases at this time. It is our thought that any contribution of $2000 by Evans is so little that it would not be attractive to us. We shall expect a much more substantial contribution from him, and as a matter of fact, we shall expect Evans to carry most of the load of any contemplated settlement of these cases. We might as well so indicate to him and to his attorney,

and that if our Company makes any contribution toward settlement it will be most nominal and not greatly in excess of what it would cost us to try these lawsuits. . . .

"If these allegations [that Evans rented to De Marco while De Marco was in an intoxicated condition] are proven then Evans would have no insurance coverage under the policy, in view of his violation of the policy provisions, and we would be at liberty to withdraw from the defense of the action. . . .

"Before any consideration is given to settlement values, we are of the opinion that the deposition of De Marco and his companion should be taken. They should be allowed to testify to their intoxicated condition and allowed to paint the picture as black as they care to. After such depositions are secured, we can then go to Evans and to his attorney and point out to them the lack of insurance coverage, and at that time insist that they take over the burden of settlement of these cases."

The Seattle claims agent testified that, notwithstanding the directive or suggestion contained in this letter, nothing was ever done toward securing the deposition of De Marco or his companion and that this letter was never handed to appellant's attorneys. There is no indication in the evidence, however, that the attitude of appellant toward negotiating a settlement ever changed in any way subsequent to the date on which the letter was written.

Respondent's attorneys, in a lengthy letter to appellant dated November 11, 1949, reviewed the position which appellant had taken with regard to its defense of the tort actions and advised it that respondent would not permit it to defend with a reservation of its rights to disclaim coverage and withdraw from the defense.

Respondent restated his demand that appellant defend without reservation or surrender the defense to him. He contended that appellant had placed itself in a position where its interests conflicted with and were antagonistic to his, in that it would be to appellant's advantage to allow or help the plaintiffs in the tort actions to prove that De Marco was under the influence of intoxicants at the time he rented or extended the rental of the automobile. He stated this contention as follows:

"Under your statement of the conditions, it is at once clear that your interests would be best served by proving the very things that the plaintiffs contend. It is, therefore, obvious that your attorney cannot defend Mr. Evans when your company would be able to avoid all liability by helping the plaintiff prove the things which would cause liability on the part of Mr. Evans."

He demanded that appellant withdraw its reservation of rights letters dated February 8th and August 15th. He pointed out the inherent risks involved in any lawsuit and that respondent's potential liability in the tort cases was seventy-seven thousand dollars in excess of the policy limits. He urged that the two suits be settled and offered to make a contribution for that purpose.

Appellant answered with an equally lengthy letter dated November 28, 1949, in which it challenged respondent to point out any evidence which would give rise to a suspicion of bad faith on its part. It assured respondent that it was willing that his attorneys should work with it in preparing the defense "in such a way as will guarantee a solid front against the plaintiffs." It refused to comply with respondent's demands and insisted upon its claimed right to conduct the defense under a reservation of rights to disclaim coverage and withdraw from the defense if the proof showed that De Marco was under the influence of intoxicants at the time of the rental. It warned respondent that if he should force appellant to withdraw from the defense its only alternative would be to disclaim liability entirely. With reference to the question of the settlement terms advocated by respondent, the letter read in part as follows:

"You have referred to a failure on our part to carry out an obligation with reference to attempting adjustment. You have accused us of bad faith. We are satisfied to stand on the record. True it is that we have not agreed to pay what amounts to, according to your own figures, approximately $6,000 or $7,000 in addition to the $2,000 which Mr. Evans indicated he would pay, the payment of such combined sums apparently being sufficient to bring about settlements. We think there is sound basis for our position. To put it very bluntly, we feel that the chances favor ultimate liability

being fixed against Mr. and Mrs. Evans under the allegations pertaining to intoxication as distinguished from the other allegations. Our reason for this belief is not because of any evidence that we control, but rather because our file data reflects that there is a rather close working arrangement between witness James Hubert, De Marco, DeMarco's personal attorney, and the attorneys for these plaintiffs. . . .

"We are willing to further discuss the matter of splitting the settlement payment. We believe these plaintiffs and their attorneys are equipped with facts and circumstances which are very detrimental to Mr. and Mrs. Evans and which expose them to potential loss greatly in excess of the sum which plaintiffs' attorneys have indicated would be acceptable by settlement. However, the coverage situation being what it is, it is inconceivable that anyone should charge the Continental with bad faith or being arbitrary and such like in refusing to pay the major portion of such settlement sum."

Thereafter, on December 30, 1949, respondent settled the two tort actions brought against him, paying from his own funds a total of $9,250.00 ($5,869.89 in the Filer case and $3,380.11 in the death case), and subsequently procured releases and dismissals with prejudice in both actions.

It was stipulated in writing between respondent and appellant, prior to the trial of this case, that the amount paid by respondent in settlement of each of the tort actions brought against him, was a reasonable sum for him to pay in settlement of each case under the attendant facts and circumstances.

At this point, it is necessary to consider the pleadings in order to have in mind the specific issues which were before the trial court. The complaint in paragraphs XIII and XV stated the gist of the action as follows:

"XIII

"That despite repeated oral demands of the plaintiff, R. H. Evans, and his attorneys that the said defendant, Continental Casualty Co., proceed with the defense of the said Kelleher and Filer actions, without reservations, and accept liability for any judgments that might be rendered against R. H. Evans, its assured, up to the limits of coverage contained in said policy, the said defendant, Continental Casualty Company, refused so to do and persisted in its position that if intoxication of De Marco were proved at the trial as

aforesaid, it would disclaim coverage and withdraw from the defense. That further, when advised by the plaintiff through his attorneys that the plaintiff, R. H. Evans, would contribute $2000.00 of his personal funds toward the settlement of the Kelleher case and a similar amount for the Filer case, and when requested to contribute $3000.00 of its funds in each case toward a settlement of the said Kelleher and Filer cases, defendant refused to make such contribution and refused to cooperate in an attempt to make settlement of said cases along such lines, although the defendant, Continental Casualty Company, well knew, or in the exercise of good faith or ordinary care, should have known, that the said Kelleher and Filer cases were potentially extremely dangerous, both from a legal and factual standpoint, and both to the plaintiff Evans and the defendant Continental Casualty Company in amounts greatly in excess of $8000.00."

"XV

"That by reason of the defendant maintaining its said position as aforesaid in which its interests conflicted with those of the plaintiff, and by reason of the defendant's wrongful, negligent and bad faith, refusal to accept the defense of the said Kelleher and Filer actions without reservation while insisting upon its right to control the defense of said actions and, further, by reason of ·the defendant's negligent and bad faith refusal to effect a settlement of the said Kelleher and Filer actions within the limits of the coverage of its insurance policy, even with a $2000.00 contribution from the plaintiff's assured, the plaintiff Evans, in order to protect himself from the risk of a great and substantial adverse judgment in each case, effected a settlement of the said Kelleher and Filer cases for a total sum of $9,250.00, of which amount $3,380.11 was paid in the Kelleher case and $5,869.89 was paid in the Filer case. That the amounts paid in the settlement of each of said cases were paid by the plaintiff R. H. Evans from his own funds, were reasonable amounts under all the facts in each case, and that said settlements were effected by the said plaintiff, R. H. Evans in good faith and after full investigation of all the facts and upon advice of plaintiff's counsel. That as a result of said settlements so effected, plaintiff secured dismissals with prejudice of both the Kelleher case and the Filer case."

Appellant denied all the allegations of paragraph XV in its amended answer and, referring to paragraph XIII, answered:

"Answering paragraph XIII, defendant admits that it refused to proceed with the defense of the said Kelleher and Filer actions, without reservations, and further admits that it refused to contribute $3,000.00 of its funds in each case toward settlement thereof, and, except as herein admitted, defendant denies each and every other allegation therein contained."

The only affirmative defense asserted was the "no action" clause in the policy which provides:

"No action shall be maintained against the Company under this policy unless brought after the amount of loss shall have been finally determined either by judgment against the Assured after actual trial or by written agreement of the Assured, the Claimant and the Company."

In his reply, respondent alleged that, assuming this clause to be applicable, appellant had, by its conduct in breaching the policy, released respondent from any obligation to comply with this clause and, in the alternative, that appellant was estopped by its conduct to require compliance with it.

The two issues made by the pleadings were:

1. Did appellant breach its contract by insisting over respondent's objection upon retaining control of the tort litigation with a reservation of rights?

2. Was appellant guilty of bad faith in refusing to cooperate with respondent in trying to effect a settlement of the tort actions?

Appellant assigns as error the action of the trial court in overruling appellant's demurrer, in denying its motion to dismiss the action at the conclusion of the trial, in determining that appellant breached its contract by assuming the defense of the two actions conditionally, in failing to sustain the affirmative defense under the "no action" provision of the policy, and in entering judgment for respondent.

Appellant states in its brief that the only question involved is that raised by the demurrer: Must the insurer, where the complaint in a tort action alleges facts both within and without the policy coverage, defend without reservation? Does the insured have a right in such case to settle

without the insurer's consent and hold the insurer liable therefor when it had agreed to defend conditionally?

■ We do not find it necessary to discuss these questions because the findings (not being assigned as error) constitute the established facts of the case. Rule on Appeal 43, 34 A Wn. (2d) 47. The only question presented, therefore, is whether or not the findings support the judgment.

In Findings Nos. XIII and XV the court found, in part, as follows:

"That further, when advised by the plaintiff through his attorneys that the plaintiff, R. H. Evans, would contribute $2000.00 of his personal funds toward the settlement of the Kelleher case and a similar amount for the Filer case, and when requested to contribute $3000.00 of its funds in each case toward a settlement of the said Kelleher and Filer cases, defendant refused to make such contribution and refused to cooperate in an attempt to make settlement of said cases along such lines, although the defendant, Continental Casualty Company well knew, or in the exercise of good faith or ordinary care, should have known, that the said Kelleher and Filer cases were potentially extremely dangerous, both from a legal and factual standpoint, and both to the plaintiff Evans and the defendant Continental Casualty Company in amounts greatly in excess of $8000.00. . . .

"That . . . by reason of the defendant's wrongful refusal to effect a settlement of the said Kelleher and Filer actions within the limits of the coverage of its insurance policy, even with a $2000.00 contribution from the plaintiff assured, the plaintiff Evans, in order to protect himself from the risk of a substantial adverse judgment in each case, effected a settlement of the said Kelleher and Filer cases, . . ."

Upon the issue of fact presented to the trial court whether there was bad faith on the part of appellant in refusing to co-operate in an attempt to settle the two tort actions, the court thus found against appellant.

■ An insured can recover from his insurer the amount of a judgment rendered against him, including the amount in excess of the policy limits, when the insurer has been guilty of bad faith in failing to effect a settlement for a smaller sum. In some jurisdictions, the insured can recover

for negligence of the insurer in failing to effect a settlement. 8 Appleman, Insurance, 80, § 4713. *Douglas v. United States Fidelity & Guaranty Co.,* 81 N. H. 371, 127 Atl. 708, 37 A. L. R. 1477. The courts are not in agreement in holding the insurer liable for negligence in failing to settle, but there is no disagreement with respect to the insurer's liability where bad faith appears. *McCombs v. Fidelity & Cas. Co. of New York,* 231 Mo. App. 1206, 89 S. W. (2d) 114. See *Burnham v. Commercial Cas. Ins. Co.,* 10 Wn. (2d) 624, 117 P. (2d) 644.

While there is no question concerning the insurer's liability for the entire amount of a *judgment* where it has been guilty of bad faith, the question remains: Should an insured be permitted to *settle* the tort claims under such circumstances and then recover from the insurer the amount paid in settlement together with his reasonable attorney fees and expenses?

We are of the opinion that the insured should recover the amounts so paid, up to the policy limits, provided that such sums were reasonable and were paid in good faith. Respondent has not cross-appealed from the action of the trial court in limiting his recovery in regard to the Filer settlement to the policy limit of five thousand dollars. The stipulation of the parties stated that the sums paid by respondent in settlement of each case were reasonable, and appellant does not complain of the trial court's finding that respondent acted in good faith in effecting settlement.

The situation presented here does not differ in principle from that in which the insurer denies liability and refuses to defend. While it has been held that under those circumstances there is no duty on the insured to mitigate damages by effecting a favorable settlement (*Carthage Stone Co. v. Travelers' Ins. Co.,* 274 Mo. 537, 203 S. W. 822), it is well established that the insured may settle and recover from the insurer. *St. Louis Dressed Beef & Provision Co. v. Maryland Cas. Co.,* 201 U. S. 173, 50 L. Ed. 712, 26 S. Ct. 400; *Traders & General Ins. Co. v. Rudco Oil & Gas Co.,* 129 F. (2d) 621, 142 A. L. R. 799; 8 Appleman, Insurance, 33, § 4690.

The similarity between the facts of the *Rudco Oil* case and those of the present action makes much of what the court said in that decision appropriate here. In upholding the right of the Rudco Oil & Gas Co. to recover of its insurer the sum paid in prudent settlement of a claim, the court said:

"We think, however, the rule [that the insurer must exercise good faith and honest judgment in its approach to settlement negotiations] applies with equal force to a prudent settlement made by the assured in the face of a potential judgment far in excess of the limits of the policy. Why should the assured be required to wait until after the storm before seeking refuge.

"Therefore, as a guide for the determination of the question presented here, we think it may be fairly stated that before Traders & General [the insurer] may interpose the voluntary settlement made by Rudco as a bar to recovery upon the policy, it must be shown that it acted, not alone in furtherance of its own interest, but it must also appear that it acted in good faith and dealt fairly with the assured. Its manifest attitude and course of conduct must have some legal justification and factual basis.

"Rudco was faced with suits aggregating $63,000 for personal injuries and death, arising out of its alleged negligent conduct. The injuries were admittedly serious and the element of damages gross and palpable. It was conscientiously convinced of its negligent liability. The limit of its protection under its policy was $10,000; its potential loss was therefore far greater than that of the Traders & General. Traders & General had investigated the claims; it is its business to appraise potential liability and losses. In the face of the facts shown upon the record, Traders & General had no standing to contend against the liability of Rudco, or the likelihood of a recovery far in excess of the limits of the policy. Rudco had the right to demand not a settlement on its terms and conditions, *but a good faith co-operation on the part of Traders & General, wherein both parties would face the facts realistically and with a mutual respect for the interest of each.* . . .

"*Each of the parties to the contract owed to the other an express and implied duty to respect its rights and interests, and to approach the common problem realistically with open hands and without concealed weapons.* . . .

"We recognize the evils inherent in any rule which permits, or justifies, a compromise or settlement by the assured without the consent of the insurer, yet we are unwilling to say that in no circumstances is such conduct justified.

"Under the peculiar facts, shown here to exist, we hold that the course of conduct pursued by the Traders & General does not square with the standard of good faith and fair dealing which underlies the contract between the parties, and it is therefore without standing to assert its only defense." (Italics ours.)

That a reasonable settlement made in good faith has many of the attributes of a judgment, was recognized by the United States supreme court in the *St. Louis Dressed Beef* case, *supra,* when, speaking through Mr. Justice Holmes, it said: "A sum paid in the prudent settlement of a suit is paid under the compulsion of the suit as truly as if it were paid upon execution."

■ The present action, which is grounded upon the insurer's bad faith in failing to perform a contractual obligation, sounds in tort, and therefore the "no action" provision of the policy pleaded by appellant as an affirmative defense is inapplicable.

We therefore conclude that the complaint stated a cause of action for damages arising from bad faith on appellant's part in refusing to co-operate in effecting a settlement of the tort actions, and that the court's finding of bad faith (which is conclusive) supports the judgment entered.

As heretofore stated, we do not find it necessary to express an opinion on the issue as to whether under the circumstances appellant breached its contract to defend the tort actions by insisting upon its claimed right to control the defense under a reservation of rights.

The judgment is affirmed.

SCHWELLENBACH, C. J., MALLERY, GRADY, and WEAVER, JJ., concur.

---

August 6, 1952. Petition for rehearing denied.