[No. 39456.   Department Two.   May 1, 1969.]

NICK BOSKO et al., *Respondents and Cross-appellants,* v.
PITTS & STILL, INC., et al., *Appellants.**

*Reported in 454 P.2d 229.

*Lawrence M. Ross* (of *Ross & Schweinler*), for appellants.

*Comfort, Dolack, Hansler & Billett,* by *Robert A. Comfort,* for respondents and cross-appellants.

HILL, J.—Nick Bosko, Russell G. Davis and John F. Heard, dba Bosko Engineering Company (hereinafter Bosko), brought this action against Pitts & Still, Inc., a general insurance agency,[1] and an unknown underwriter at Lloyd's of London (hereinafter Lloyd's) for the failure of the insurer to pay claims and defend an action arising from the activities of Bosko in the construction of a sewer line.

In the spring of 1962, Bosko had entered into a contract with the city of Tacoma for the construction of a sewer line. Under the contract, Bosko was required to take out insurance to cover any claims arising out of the construc-

---

[1] Dismissed with prejudice, and not a party to the appeal.

tion. Bosko contracted for this insurance through Pitts & Still, Inc., general agent for Lloyd's. The policy purchased was a "Broad Form Property Damage Liability" subject to a $250 deductible. The policy provided, *inter alia,* that

> [T]he Insurers agree to provide coverage from and against all loss which the Assured may sustain or incur by reason of or in consequence of:
>
> (a) Any and all liability imposed by law against the Assured for loss of or damage to or destruction of property of others (including but not limited to, damage resulting from loss of use of property damaged or destroyed and all other indirect and consequential damage for which legal liability exists in connection with such damage to or destruction of property of others) sustained or alleged to have been sustained during the currency of this Insurance and arising from any cause whatsoever out of the operations, activities, work and/or business of the Assured . . . in connection with the Assured's business as stated above; . . .

During the construction of the sewer line, it became necessary for Bosko to dispose of certain excavated waste material. Arrangements were made to dump such material on property owned by one Engoe. This property was situated on the edge and slope of a gulch through which ran the track of the Chicago, Milwaukee, St. Paul and Pacific Railroad (hereinafter Milwaukee). This was a rather deep and steep gulch. The Engoe ownership ran from the street level at the top of the gulch to about 30 feet from the toe of the slope; and it was stipulated that the Milwaukee right-of-way "extends about 50 feet east of the tract [track], the easterly 30 feet being a continuation of the steep Engoe slope previously mentioned." The waste material (approximately 50 truckloads) was transported to the site by dumptruck on May 22, 1962, and was dumped at the top of the gulch. On May 28, 1962, the waste material suddenly, and without warning, slid down the side of the gulch with part of it coming to rest on the Milwaukee track and the remainder (approximately 1700 yards) resting on the steep hillside which was part of Milwaukee's right-of-way. One of Milwaukee's engines ran into the slide and sustained $22

physical damages, with the accident resulting in a delay costing Milwaukee an additional $25.02. On the next day, Bosko's employees cleaned the material off the track at a cost of $100. The material which lay on the right-of-way slope, however, was not cleaned off or stabilized. Shortly thereafter and several times during 1962, Milwaukee demanded that Bosko make restitution for the damage to the track and engine and that Bosko remove the remaining material from its right-of-way. Bosko took no action on these demands except to forward them to the insurer. The insurer refused to take action on the demands, contending that the material resting on the right-of-way constituted a trespass not covered by the policy and that the amount of physical damage to the track and the engine was not in excess of $250, therefore excusing the insurer from liability under the deductible clause.

In December 1962 and early 1963, there occurred four additional slides during which some of the material slid further down the slope and onto the track. These slides required expenditures totaling $335.41 by Milwaukee to clear its track.

On June 5, 1964, Milwaukee brought an action against Bosko for $171.15 for certain specific items of damage and for $3,000 for the correction of the then existing condition, *i.e.*, waste material still on its right-of-way slope. Bosko tendered defense of the suit to the insurer; the tender was refused and it was necessary for Bosko to retain attorneys to defend the suit. Eventually this suit was settled for a total of $1,913.27. This included the $47.02 for damages to the engine and the cost of the delay caused by the original slide; $335.41 for removing the material from the subsequent slides from the track; and $1,330 for future correction and abatement of the material on the slope of the right-of-way, together with 10 per cent of the foregoing items for supervisory costs $171.24 and $20.60 court costs.

It was stipulated that the cost of stabilizing the material immediately following the first slide would have been approximately $3,000. In the settlement of the Milwaukee

suit, Bosko's attorneys spent a total of 39¼ hours; Bosko was charged $750 for their services, and paid that amount.

In March, 1965, Bosko brought this action, claiming coverage under the policy and asking for $1,663.27 (the $1,913.27 settlement less the $250 deductible), plus attorneys' fees incurred in the settlement, plus $53.80 in incidental costs, for a total of $2,467.07. The insurer answered, denying coverage for reasons hereinafter discussed. The trial court concluded that the insurance policy covered the losses and damages resulting from the slide and that the insurer breached the policy in refusing to defend the action brought by Milwaukee. The trial court awarded Bosko damages of $1,394.42 plus court costs, but allowed only $500 of the $750 attorneys' fees in the Milwaukee litigation, for a total of $1,923.12.

The explanation of the difference between the $1,663.27 prayed for and the $1,394.30 allowed by the trial court is that the trial court refused to allow the $335.41 (plus 10 per cent for supervision) expended for cleaning up after the four subsequent slides in December 1962 and early 1963, following the original slide in May 1962, on the ground that they were "too remote." The trial court did, however, allow the additional $100 which it had cost Bosko to clean up the Milwaukee track after the first slide.

Lloyd's appeals from the judgment, and Bosko cross-appeals from the failure of the trial court to allow recovery as to the subsequent slides and the failure to allow the full amount of the attorneys' fee.

These appeals raise several substantive issues dealing with the policy coverage.

1. Did the policy cover the cost of stabilization of the waste material which had not yet physically damaged Milwaukee's track or equipment?

It is conceded that the costs of repairing Milwaukee's engine and of removing the debris from the track immediately after the first slide were not in excess of the $250 deductible clause. It is further conceded that the major portion of Milwaukee's claim against Bosko was for the

costs of stabilizing the material on the hillside that was part of Milwaukee's right-of-way, so that it would not slide further down the hill and onto the track. The insurer urges that since this material had not yet caused any actual damage to Milwaukee's property, the costs of stabilizing the material were not covered by the policy. However, the insurer overlooks a recognized area of the law of torts as well as the explicit terms of its own contract.

██ The presence of the waste material on Milwaukee's right-of-way was clearly a trespass, conceded to have been caused by Bosko's negligence in failing "to put in a retaining wall or other factor to shore up and hold said 50 truckloads of waste material." See Restatement (Second) of Torts § 165 (1965). In such a case the possessor of the land is entitled to recover damages from the person causing the trespass. This right in Milwaukee to recover from Bosko is a

> liability imposed by law against [Bosko] for . . . damage to . . . property of [Milwaukee] . . . sustained during the currency of this Insurance and arising from . . . the operations, activities, work and/or business of [Bosko] . . .[2]

and thus presents a prima facie case of coverage under the policy, and the burden is on the insurer to prove that the sliding of the waste material was not within the coverage of the policy. *Labberton v. General Cas. Co. of America,* 53 Wn.2d 180, 186, 332 P.2d 250 (1958); *Hill v. Great N. Life Ins. Co.,* 186 Wash. 167, 57 P.2d 405 (1936). The insurer's contention that the mere presence of the material on the right-of-way had not resulted in actual damages to Milwaukee's property does not carry that burden. The presence of the material on the steep hillside on the Milwaukee right-of-way and above its track constituted an ever present danger of inundation by further slides, which could cause further damage to its track and equipment. This constituted an interference with Milwaukee's unrestricted use and en-

---

[2] Quoted material (not including bracketed words) is from Lloyd's policy protecting Bosko. Exhibit No. 5.

joyment of its right-of-way (see *Labberton v. General Cas. Co., supra* at 186-187), which could be remedied only by removal or proper stabilization of the waste material then wrongfully and precariously resting on the slope of that right-of-way. Milwaukee clearly was damaged to the extent of the expense required to remove or stabilize the material. That, by the law of trespass, Bosko was liable for this expense is not the sole basis for the insurer's liability in this situation. The liability to Milwaukee for the slide and the consequential damages resulting from the need of stabilizing the material on the hillside fell squarely within the coverage of the policy, and the trial court properly so determined.

2. Was the insurer excused from liability because Bosko had insurance with an unrelated third-party insurer covering the loading and unloading of its trucks?

The Lloyd's policy provided:

8. OTHER INSURANCE. In the event that there shall be in effect any other good, valid and collectible Insurance inuring to the benefit of the Assured, or any additional Assured hereunder, with respect to loss or claim covered hereby, then this insurance shall be excess insurance only, over and above the amount of any such good, valid and collectible insurance.

Bosko was insured by the United Pacific Insurance Company (hereinafter United), against any liability for damages imposed upon Bosko because of its "ownership, maintenance or use of any automobile, including the loading and unloading thereof." It was stipulated that the trucks which dumped the material were covered by this policy. It, however, was not conceded that the United insurance covered the damages resulting from this particular dumping operation. Lloyd's argues that the damages resulted from the unloading of the trucks and were thus covered by the United insurance, thereby excluding Lloyd's from liability under its policy. This contention fails for several reasons.

First, the slides did not result from the negligent unloading of the trucks. The material laid where it was dumped for 6 days before sliding; it was not just dumped out of the

trucks, down the hill and onto the track. The slides were the result of the seasonal rain and of the failure of Bosko's employees to "put in a retaining wall or other stabilizing factor to shore up and hold"[3] the waste material where it was dumped. No matter what mode of transportation was used to move the material to the dump site, the slides still would have occurred if the material were dumped in the same place without proper shoring up. The cause of the slide was not the use of the trucks and the unloading thereof, but the intervening negligence of Bosko.

Second, the United policy provided that it did not cover damages arising after the operations had been completed. Despite Lloyd's arguments to the contrary, it is clear that Bosko had completed its dumping operations. All the dumping was done in a single day and there was no further dumping by Bosko at this site. The slide occurred 6 days after the dumping. Thus, even if the United insurance could apply to the damages arising from these particular operations of the insured trucks, the work of the trucks was completed and the damages fell within the exclusionary clause in the United policy.

▮ Third, Lloyd's made no contention that the United insurance covered the damages in this case until after the commencement of this suit in March 1965, almost 3 years after the initial slide. Under the United policy, Bosko was required to give written notice of an accident to United "as soon as practicable." Since Bosko was not given notice that Lloyd's would raise the United insurance as a defense until almost 3 years after the accident, Bosko had not notified United of the slides. Certainly, Bosko's giving of notice to United almost 3 years after the slides would not qualify as "as soon as practicable" and undoubtedly would excuse United from its obligation under the policy. *See e.g., Sears, Roebuck & Co. v. Hartford Accident & Indem. Co.,* 50 Wn.2d 443, 313 P.2d 347 (1957) (almost 14-months delay in giving notice held to excuse insurer); *Deer Trail Consol.*

---

[3]Stipulation of Facts.

*Mining Co. v. Maryland Cas. Co.,* 36 Wash. 46, 78 P. 135 (1904) (delay of 8 months excused insurer); *see also* the case collection in supplements to 18 A.L.R.2d 455, § 16 (1951) which indicate that periods ranging upwards from 21 days were unreasonable delays in giving notice and could excuse the insurer; 13 G. Couch, Cyclopedia of Insurance Law § 49.122 (2d ed. 1965) indicates that delays of more than 18 days may well constitute an unreasonable delay. Thus, the United insurance is no longer "collectible" and Lloyd's must remain as the primary insurer and is not excused from liability.

Finally, it is the general rule that if an insurer denies liability under the policy for one reason, while having knowledge of other grounds for denying liability, it is estopped from later raising the other grounds in an attempt to escape liability, provided that the insured was prejudiced by the insurer's failure to initially raise the other grounds. *Moore v. National Accident Soc'y,* 38 Wash. 31, 80 P. 171 (1905); *D'Aquilla Bros. Contracting Co. v. Hartford Accident & Indem. Co.,* 22 Misc. 2d 733, 193 N.Y.S.2d 502 (1959), *modified on other grounds,* 15 App. Div. 2d 509, 222 N.Y.S.2d 409 (1961); *Lancon v. Employers Nat'l Life Ins. Co.,* 424 S.W. 2d 321 (Tex. Civ. App. 1968); *Middlebrook v. Banker's Life & Cas. Co.,* 126 Vt. 432, 234 A.2d 346 (1967). In argument before this court, Lloyd's contended that it was unaware at the time of the slides that Bosko was covered by another insurer and therefore the rule above is inapplicable. Such a position ignores reality. It is commonly known that most businesses using automobiles have insurance covering the hazards arising from the use of such automobiles. Lloyd's knew that the dumping was done by trucks and, therefore, should have known, or at least should have been put on inquiry, whether the trucks were covered by a separate automobile insurance policy. An insurer is charged with the knowledge which it would have obtained had it pursued a reasonably diligent inquiry. See *Union Ins. Exch., Inc. v. Gaul,* 393 F.2d 151 (7th Cir. 1968); *Fecht v. Makowski,* 172 So.2d 468 (Fla. 1965). An insurer

should not be able to escape its contractual obligations by purposely keeping itself ignorant of essential facts. Not having made such an inquiry and in view of the fact that Bosko is now precluded from any recovery on the separate automobile insurance, Lloyd's is estopped from raising as a defense to this action the existence of the United insurance. 3. Did the fact that the dumping was done by trucks excuse Lloyd's from its obligations under its policy?

The Lloyd's policy provided in part that:

This Insurance does not cover Liability:

. . .

> (f) For damage to property arising out of the use, ownership, maintenance, operation or control of any· automobile . . . except while at the job site or plant premises of the Assured.

Lloyd's argues that since the dumping was done by trucks, which concededly are automobiles within the meaning of this provision, the policy did not cover the damages arising from the dumping. As we have heretofore pointed out, the use of the dumptrucks to transport the waste material to the dump site was merely incidental to the slides caused by the negligence of Bosko's employees in failing to properly stabilize the waste material. Had reasonable care in stabilizing or shoring up the material been practiced, the slides would not have occurred 6 days after dumping. It is apparent that the slides did not result from the "use, ownership, maintenance, operation or control of any automobile."

We find no basis for Lloyd's appeal from the judgment entered.

We turn now to the consideration of the cross-appeal and Bosko's insistence that it should have been reimbursed for the $335.41 (plus 10 per cent) which it paid Milwaukee to reimburse it for the expenses incurred as a result of the December 1962 and the 1963 slides, generally called the "subsequent slides" to distinguish them from the original slide of May 28, 1962.

Lloyd's policy included a provision giving rise to a duty on the part of its insured, Bosko, to use due diligence and

to do all things reasonably practicable to diminish any losses likely to give rise to a claim under the policy. It is stipulated that after the first slide which left some 1700 yards of waste material precariously resting on the slope of the Milwaukee right-of-way, Bosko took no steps to prevent further slides, even though Milwaukee demanded that such be done and would have allowed Bosko's employees to enter the right-of-way to undertake such work. Six months after the first slide four subsequent slides occurred in relatively quick succession. Lloyd's took the position, and the trial court agreed, that these damages resulted from the failure of Bosko to use due diligence in remedying the slide situation and therefore Bosko is not entitled to recover the amount paid Milwaukee in consequence thereof.

On this issue we agree with Lloyd's. The damages from the subsequent slides proximately resulted from Bosko's failure between May and December 1962 to correct a concededly dangerous situation existing after the initial slide. Bosko very plausibly argues that by doing nothing it settled for $1,330 a claim for stabilization of the hillside or removal of waste material which would have cost $3,000 had it been done after the first slide in May 1962, thus saving Lloyd's $1,670. Consequently Lloyd's should pay the $335.41 (plus 10 per cent) which Bosko had to pay Milwaukee as a result of the four subsequent slides.

■ This is a non sequitur. Lloyd's should be held to its obligations under the policy, but Bosko also had obligations under the policy, and one was to do all things reasonably practicable to diminish losses likely to give rise to a claim. It was reasonably practicable to have prevented the subsequent slides, but Bosko did nothing. It did not take its "do nothing" position for Lloyd's benefit, but for its own. Bosko took the position that it was no longer responsible inasmuch as it had tendered the remedying of the situation to Lloyd's whose duty it became to stabilize the material. Bosko certainly did not make apparent that its intent in waiting was to diminish the cost of stabilization, and inasmuch as Bosko's waiting cannot be said to have been good-

faith effort to reduce damages, it must be held responsible for the damages resulting from the subsequent slides, which were due to its failure to comply with the provision requiring mitigation. We agree with the trial court that Bosko is not entitled to recover the amounts it paid Milwaukee for clearing the tracks after the subsequent slides.

The other facet of the cross-appeal relates to attorneys' fees.

■ In the process of settling the suit brought by Milwaukee against Bosko as a result of the slides, Bosko was required to pay $750 in attorneys' fees, as well as other incidental expenses. Under the policy, Lloyd's was obligated:

(i) to investigate and/or to defend in the name and on behalf of the Assured all claims or suits for such injury or damage for which the Assured is, or is alleged to be liable; (ii) to pay in addition to the limits of liability expressed in the Schedule above, all expenses incurred by the Insurers for investigation, negotiation and defense of any such claims or proceedings . . . [and] all costs taxed against the Assured in any such proceedings . . .

Such a clause obligates an insurer to defend any action brought against an insured which falls within the policy coverage. *Hering v. St. Paul-Mercury Indem. Co.*, 50 Wn.2d 321, 311 P.2d 673 (1957).

The failure of an insurer to defend when the subject matter of the suit is within the policy coverage constitutes a breach of the insurance contract and entitles an insured to recover not only the damages assessed against him (within policy limits *but cf.* Comment, 43 Wash. L. Rev. 799 (1968)), but also his reasonable attorneys' fees and other incidental costs of defending the suit. *Kong Yick Inv. Co. v. Maryland Cas. Co.*, 70 Wn.2d 471, 423 P.2d 935 (1967); *Hering v. St. Paul-Mercury Indem. Co., supra; Evans v. Continental Cas. Co.*, 40 Wn.2d 614, 245 P.2d 470 (1952); 28 Wash. L. Rev. 239 (1953); *see also* Annot., 49 A.L.R.2d 694 (1956). Lloyd's refusal to defend the action brought by Milwaukee against Bosko breached its contract.

Bosko therefore is entitled to recover its reasonable attorneys' fees and other incidental costs from Lloyd's. The trial court allowed Bosko the full amount of its incidental costs, but limited recovery of attorneys' fees to $500 of the $750 incurred and paid by Bosko.

While the trial court has the discretionary power to limit attorneys' fees to a reasonable amount (see *Lawrence v. Northwest Cas. Co.*, 50 Wn.2d 282, 311 P.2d 670 (1957)), we believe that in the present case the trial court abused its discretion in limiting the amount of attorneys' fees to only $500. It was stipulated that Bosko's attorneys spent a total of 39¼ hours in the defense and settlement of the Milwaukee litigation and that the time spent was a reasonable amount.

The only argument advanced by Lloyd's is that the amount billed to Bosko for such hours, $750, was unreasonable. We cannot agree. The charge of $750 was below the recommended minimum fee for that number of hours. At the time of the Milwaukee suit, the Tacoma-Pierce County Bar Association Minimum Fee Schedule recommended a charge for office time of $20 per hour. Had this schedule been followed in the Milwaukee litigation the fee would have been $785. Since the actual fee was lower than the recommended minimum, we fail to see any ground for limiting the recovery of fees to an even lower amount. Bosko therefore is entitled to recover the amount it paid to its attorneys for the settlement of the Milwaukee litigation.

With this single modification, the judgment is in all respects affirmed.

HUNTER, C. J., HALE and NEILL, JJ., and DONWORTH, J. Pro Tem., concur.