161 P.3d 406 (2007)
James and Deborah SHARBONO, individually and the marital community composed thereof; Cassandra Sharbono, Respondents/Cross-Appellants,
v.
UNIVERSAL UNDERWRITERS INSURANCE COMPANY, a foreign insurer, Appellant/Cross-Respondent, and
Len Van De Wege and "Jane Doe" Van De Wege, husband and wife and the marital community composed thereof, Appellants.
No. 33379-1-II.
Court of Appeals of Washington, Division 2.
June 26, 2007.
*410 Philip Albert Talmadge Emmelyn Hart-Biberfeld Talmadge Law Group PLLC Tukwila, WA, Dan'l Wayne Bridges McGaughey Bridges Dunlap PLLC Bellevue, WA, for Appellants.
Timothy R. Gosselin, Attorney at Law, Tacoma, WA, for Respondents.

PUBLISHED OPINION
ARMSTRONG, J.
¶ 1 Cassandra Sharbono lost control of her truck, crossed into the oncoming traffic lane, and hit a car Cynthia Tomyn was driving. Cynthia Tomyn died as a result of the accident and her family claimed damages against Cassandra's parents, James and Deborah Sharbono (the Sharbonos), who owned the vehicle Cassandra was driving. The Sharbonos had primary liability coverage with State Farm Insurance Company and umbrella coverage under their commercial and personal liability policies with Universal Underwriters Insurance Company. The Sharbonos claimed that they had three umbrella policies; Universal advised them they had only one umbrella policy with a $1,000,000 limit. During settlement negotiations with the Tomyns, the Sharbonos several times asked Universal to produce its underwriting file so that they and the Tomyns would know the extent of the Sharbonos' liability coverage. Universal refused. The Tomyns and the Sharbonos ultimately settled for $4,525,000, and the Sharbonos then sued Universal to establish coverage and to recover damages for Universal's alleged bad faith in refusing to produce its underwriting file. The trial judge granted the Sharbonos summary judgment, declaring that they had coverage under three policies for a total of $7,000,000; the trial court also ruled that Universal was liable for bad faith as a matter of law, and found the Tomyn-Sharbono settlement reasonable. At the conclusion of the damages trial, the jury awarded the Sharbonos $4,500,000 for Universal's bad faith. Universal appeals the jury's verdict and the trial court's summary judgments establishing coverage and finding Universal liable for bad faith. Universal also appeals the trial court's determination that the settlement was reasonable. We affirm the summary judgment declaring Universal liable for bad faith and the trial court's ruling that the Tomyn-Sharbono settlement was reasonable. We also affirm the trial court's ruling regarding the settlement's reasonableness. But we reverse the trial court's judgment establishing coverage at $7,000,000; we hold that under the policy's plain language, the Sharbonos had umbrella coverage of $1,000,000 under only one policy. And we reverse the trial court's determination that Universal violated the Consumer Protection Act. Finally, we reverse the jury verdict for bad faith damages and the trial court's dismissal of the Sharbonos' claim against their agent for negligently procuring the Universal umbrella policy.

FACTS
¶ 2 James and Deborah Sharbono owned three transmission shops: "All Transmission & Automotive," "The Trans-Plant," and "Parkland Transmission." The Sharbonos had business partners in the latter two businesses: Clarence and Claudia Ray in The Trans-Plant, and Robert and Debra Huke in Parkland Transmission.
*411 ¶ 3 In the mid-1990s, the Sharbonos and their partners bought commercial insurance from Universal, an insurer specializing in coverage for automobile dealers, auto repair shops, and associated enterprises. Universal insured the three transmission shops under separate but similar insurance policies.[1]
¶ 4 In 1997, the Sharbonos asked their Universal sales agent, Len Van de Wage, about transferring the family's personal umbrella coverage from State Farm to Universal. Universal offered personal umbrella coverage to the Sharbonos as an adjunct to the Sharbono companies' commercial policies. The Sharbonos claim that they asked Van de Wege for $3,000,000 of personal umbrella coverage. According to the Sharbonos, Van de Wege agreed to add a $1,000,000 personal umbrella to each business policy, providing a total of $3,000,000 in personal umbrella coverage. According to Van de Wege, the Sharbonos did not seek $3,000,000 in personal umbrella coverage.
¶ 5 When the Sharbonos renewed their Universal policies in 1998, they added their personal motor vehicles to their personal umbrella coverage.
¶ 6 On December 11, 1998, Cassandra Sharbono, the Sharbonos' daughter, lost control of the family truck and swerved into oncoming traffic, striking an approaching car head-on and killing Cynthia Tomyn. The police cited Cassandra for second degree negligent driving, and the Sharbonos later admitted that Cassandra was "at least partially at fault" for the accident. Clerk's Papers (CP) at 557. Cynthia Tomyn, who was 34 years old, was survived by her husband Clinton and their three minor children.
¶ 7 The Tomyns retained attorney Ben Barcus to pursue a wrongful death claim against the Sharbonos. The Tomyns initially attempted to settle with the Sharbonos, negotiating with the Sharbonos' primary auto liability carrier, State Farm, and the Sharbonos' personal attorneys, Timothy Gosselin and Maureen Falecki.
¶ 8 Over the next few months, Falecki wrote to Universal asking for documents pertaining to the Sharbonos' insurance coverage. Specifically, Falecki asked Universal to produce its underwriting files on the Sharbonos' policies, explaining that the Sharbonos believed they had $3,000,000 of personal umbrella coverage. Universal produced copies of the Sharbonos' application for the personal umbrella coverage and offered to provide the Sharbonos with any other documents they had signed or submitted. But Universal refused to produce its underwriting files, explaining that the files contained proprietary information and that it was unaware of any authority that supported Falecki's request.
¶ 9 The Sharbonos and Tomyns participated in two mediation sessions. At the first session, Universal offered to pay the Sharbonos' $1,000,000 umbrella limit toward any settlement above State Farm's $250,000 in primary coverage. The first mediation failed and Falecki again asked Universal to produce its underwriting files, stating that Universal's failure to disclose the files was one reason the mediation failed. Universal again refused.
¶ 10 At the second settlement mediation, the Sharbonos asked for Universal's underwriting files from Glenn Reid, a Universal representative who attended the mediation. Universal again refused to produce its underwriting file. After the second failed mediation, Falecki again wrote Universal asking for its underwriting files. In the same letter, Falecki advised Universal that if it failed to cooperate, the Sharbonos would assert bad faith claims against Universal. Universal still refused to produce the file and advised Falecki that if the Sharbonos sued for bad faith, it would counterclaim for abuse of process.
¶ 11 Aware of the dispute about coverage, the Tomyns' attorney threatened to sue the Sharbonos unless Universal cooperated. Universal again refused, and the Tomyns sued the Sharbonos.
¶ 12 The Tomyns subpoenaed Universal's underwriting file, and Universal moved to *412 quash the subpoena on the ground that its files were not discoverable in a suit against its insureds. The trial court denied the motion to quash and ordered Universal to produce the underwriting files. Universal then sought discretionary review; a commissioner of this court, finding probable error in the trial court's order to produce, granted review and stayed enforcement of the subpoena.
¶ 13 Before we considered the appeal, the Tomyns and Sharbonos settled. The Sharbonos agreed to confess judgment for $4,525,000 and to assign their insurance claims to the Tomyns in exchange for covenants not to execute (as to James and Deborah Sharbono) and to forebear (as to Cassandra Sharbono). The agreement also required the Sharbonos to sue Universal to recover insurance proceeds to satisfy the confessed judgment amount.
¶ 14 The Sharbonos then commenced this action against Universal and Van de Wege, alleging (1) breach of contract, (2) violation of the Consumer Protection Act (CPA), (3) negligence or negligent misrepresentation, (4) bad faith, (5) breach of quasi-fiduciary duty (Universal), (6) breach of fiduciary duty (Van de Wege), and (7) reformation.
¶ 15 The Sharbonos moved for summary judgment to establish $3,000,000 of coverage under each of their commercial policies' Umbrella Coverage Part 980. The trial court granted the Sharbonos' motion, stating that each policy's Umbrella Coverage Part 980 provided personal liability coverage to the Sharbonos. In a later ruling, the trial court found that the Sharbonos could combine the policies' limits for $6,000,000 in addition to the $1,000,000 personal umbrella coverage that Universal conceded was available.
¶ 16 The Sharbonos moved for an order declaring their settlement with the Tomyns reasonable under RCW 4.22.060. The trial court ruled that the settlement was reasonable.
¶ 17 Before trial, the Sharbonos filed a second motion for summary judgment, declaring that Universal had acted in bad faith when it refused to turn over its underwriting file to the Tomyns' attorney and when it allegedly did not explain why it denied coverage under its umbrella policies. The Sharbonos also alleged that Universal violated the CPA by forcing them to litigate to recover insurance proceeds, failing to provide the underwriting documents, and failing to provide a reasonable explanation for its position. See WAC 284-30-330(6), (7), (13). Universal also moved for summary judgment, seeking dismissal of the Sharbonos' claims for negligence or negligent misrepresentation, breach of quasi-fiduciary duty, and reformation, as well as dismissal of all claims against Van de Wege.
¶ 18 The trial court granted both motions in part. The court found Universal liable for bad faith and for violating the CPA by refusing to produce its underwriting file and for not paying the Tomyn judgment. The trial court dismissed the Sharbonos' claims for negligence, breach of fiduciary duty, reformation, and all claims against Van de Wege, explaining that its "previous rulings establish[ed] insurance sufficient to cover the underlying judgment against the Sharbonos in the Tomyn lawsuit, such that any relief the court could provide on [the Sharbonos'] claims for additional insurance would be duplicative of relief already granted." CP at 2177.
¶ 19 A jury awarded the Sharbonos $4,500,000 for damages suffered due to Universal's bad faith. The trial court then granted the Sharbonos' motion for attorney fees, costs, and treble damages under the CPA. The trial court entered a $9,393,298.63 judgment, which included the $4,525,000 settlement, $204,090 in attorney fees and costs, and $10,000 in treble damages.

ANALYSIS

I. STANDARD OF REVIEW AND GENERAL PRINCIPLES OF INSURANCE POLICY INTERPRETATION
A. Summary Judgment
¶ 20 On summary judgment, the trial court decided that Umbrella Coverage Part 980 applied to the Sharbonos' liability for Cassandra's accident.
¶ 21 We review an order granting summary judgment de novo. Go2Net, Inc. v. *413 FreeYellow.com, Inc., 158 Wash.2d 247, 252, 143 P.3d 590 (2006) (citing Troxell v. Rainier Pub. Sch. Dist. No. 307, 154 Wash.2d 345, 350, 111 P.3d 1173 (2005)). Summary judgment is appropriate where no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. CR 56(c).
B. Insurance Policy Interpretation
¶ 22 We interpret insurance policies as a matter of law. Kitsap County v. Allstate Ins. Co., 136 Wash.2d 567, 575, 964 P.2d 1173 (1998). Insurance policies are contracts, and courts seek to determine the contracting parties' intent by resorting to a fair, reasonable, and sensible construction of the contract's language, as the average insurance purchaser would understand. Am. Nat'l Fire Ins. Co. v. B & L Trucking & Constr. Co., Inc., 134 Wash.2d 413, 427, 951 P.2d 250 (1998) (citations omitted).
¶ 23 In general, we will enforce an insurance contract as written if the contract is clear and unambiguous. Allstate Ins. Co. v. Peasley, 131 Wash.2d 420, 424, 932 P.2d 1244 (1997) (citing Transcon. Ins. Co. v. Wash. Pub. Utils. Dists.' Util. Sys., 111 Wash.2d 452, 456, 760 P.2d 337 (1988)). If an insurance contract's language is neither ambiguous nor difficult to comprehend, we will enforce the intent expressed in the policy regardless of what coverage the insured may have thought he had. Dennis v. Great Am. Ins. Cos., 8 Wash.App. 71, 74, 503 P.2d 1114 (1972) (citing Jeffries v. Gen. Cas. Co. of Am., 46 Wash.2d 543, 283 P.2d 128 (1955)).
¶ 24 If ambiguities exist in the policy language, we may resort to extrinsic evidence to ascertain the parties' intent. Am. Nat'l Fire Ins. Co., 134 Wash.2d at 427, 951 P.2d 250 (citing Findlay v. United Pac. Ins. Co., 129 Wash.2d 368, 374, 917 P.2d 116 (1996)). An ambiguity exists where the insurance policy's language is susceptible to more than one reasonable interpretation. Vadheim v. Cont'l Ins. Co., 107 Wash.2d 836, 841, 734 P.2d 17 (1987) (citing Morgan v. Prudential Ins. Co. of Am., 86 Wash.2d 432, 435, 545 P.2d 1193 (1976)). We resolve any ambiguities in the insured's favor. Am. Nat'l Fire Ins. Co., 134 Wash.2d at 428, 951 P.2d 250 (citing Queen City Farms, Inc. v. Cent. Nat'l Ins. Co., 126 Wash.2d 50, 68, 882 P.2d 703 (1994), 126 Wash.2d 50, 891 P.2d 718 (1995)). If possible, we interpret a policy to harmonize the policy's provisions and avoid creating ambiguities. Tyrrell v. Farmers Ins. Co. of Wash., 140 Wash.2d 129, 133, 994 P.2d 833 (2000); see Dobosh v. Rocky Mountain Fire & Cas. Co., 43 Wash.App. 467, 471, 717 P.2d 793 (1986) (citations omitted).

II. INSURANCE POLICY COVERAGE  UMBRELLA COVERAGE PART 980
¶ 25 The Sharbonos moved for partial summary judgment to establish that Umbrella Coverage Part 980 of both the All Transmission & Automotive and The Trans-Plant insurance policies applied to the accident and provided the Sharbonos with coverage of $3,000,000 per occurrence per policy. The trial court granted the Sharbonos' motion.
¶ 26 The parties agree that the Universal insurance policies' terms are clear and unambiguous. But Universal argues that the trial court erred in finding coverage for the Sharbonos under Umbrella Coverage Part 980 for Cassandra's personal use of a family car. Specifically, Universal argues that the trial court misinterpreted Umbrella Coverage Part 980, which Universal calls the "commercial umbrella" and that, according to Universal, does not apply to Cassandra's personal use of a family vehicle.
¶ 27 The Sharbonos argue that Umbrella Coverage Part 980 covers their liability for Cassandra's accident because it is not strictly a "commercial umbrella" but a general umbrella that provides coverage for both personal and commercial losses.
¶ 28 The first paragraph of both the All Automotive & Transmission and The Trans-Plant insurance policy declarations states that: "This policy insures only those coverages and property shown in the declarations made a part of this policy. such insurance applies only to those insureds, security interests, and locations designated for each coverage as identified in item 2 by letter(s) or number." CP at 31. Item 2 in each policy lists James & Deborah Sharbono as named *414 insureds. The declarations page of each policy also sets forth the coverage limits.
¶ 29 The Umbrella Coverage Part 980 in the All Transmission & Automotive policy has a $3,000,000 coverage limit and lists All Transmission & Automotive as the insured. The Trans-Plant policy has an Umbrella Coverage Part 980 with $3,000,000 coverage that lists The Trans-Plant as the insured. The Umbrella Coverage Part 980 in the two policies is identical.[2]
¶ 30 The initial paragraph of Umbrella Coverage Part 980 states that it "applies only when it is shown in the declarations. Such insurance applies only to those insureds, security interests and locations designated for each coverage as identified in declarations item 2 by letter(s) or number." CP at 119.
¶ 31 Coverage Part 980 generally defines an insured as follows:
WHO IS AN INSURED 
. . .
With respect to any AUTO or watercraft:
(a) YOU;
. . .
With respect to (1) any AUTO or watercraft used in YOUR business or (2) personal use of any AUTO owned or hired by YOU:
(a) any person or organization shown in the declarations for this Coverage Part as a "Designated Person".
CP at 122.
¶ 32 The parties disagree as to the definition of "You." Br. of Appellant at 34; Br. of Respondent at 29. Although neither Personal Umbrella Coverage Part 970 nor Umbrella Coverage Part 980 defines "You," the insurance policies' general definitions contain the following definition: "`YOU' and `YOUR' means the person or organization shown in the declarations as the Named Insured." CP at 56.
¶ 33 The Sharbonos argue that the term "You" describes them, individually, because both the All Transmission & Automotive and The Trans-Plant insurance policies list them as "Named Insureds." CP at 31. And according to the Sharbonos, Personal Umbrella Coverage Part 980 covers them for any auto they own if the personal use is by a "Designated Person." Although Cassandra is not a designated person, the declarations page of the policies lists James and Deborah Sharbono as designated persons. Thus, according to the Sharbonos, the terms "You" (named insureds) and "Designated Persons" cover their use, which in this case is their entrustment of the vehicle to Cassandra.[3]
¶ 34 The Sharbonos are correct that the declarations pages of both policies identify All Transmission & Automotive and The Trans-Plant as "01" in the "Named Insured" section, and identify James and Deborah Sharbono as "02" in the "Named Insured" section. CP at 31, 171. But the declarations section regarding Umbrella Coverage Part 980 in both policies states that "01" is the only insured under Umbrella Coverage Part 980.[4] Accordingly, in the context of Umbrella Coverage Part 980, "You" describes only the businesses: All Transmission & Automotive and The Trans-Plant. In Umbrella Coverage Part 980, "You" does not refer to the Sharbonos individually.
¶ 35 Thus, with respect to any auto,[5] Umbrella Coverage Part 980 insures All Transmission *415 & Automotive or The Trans-Plant (depending on the insurance policy). And with respect to "personal use of any [a]uto owned . . . by" All Transmission & Automotive or The Trans-Plant, Umbrella Coverage Part 980 insures "any person or organization shown in the declarations for . . . Coverage Part [980] as a `Designated Person.'" CP at 122, 258. The declarations for Umbrella Coverage Part 980 list James and Deborah Sharbono as "Designated Persons." CP at 42, 179-80. In other words, Umbrella Coverage Part 980 provides coverage to James and Deborah Sharbono with respect to their personal use of any auto owned or hired by either All Transmission & Automotive or The Trans-Plant.
¶ 36 James and Deborah Sharbono own the truck Cassandra was driving when the accident occurred, and Cassandra testified that she normally used that truck for personal purposes. Because neither All Transmission & Automotive nor The Trans-Plant owned or hired that truck, Umbrella Coverage Part 980 does not cover Cassandra, James, or Deborah Sharbono's use of that truck.
¶ 37 The Sharbonos' argument requires the policy reader to ignore the plain language that "[s]uch insurance applies only to those insureds . . . designated for each coverage as identified in . . . item 2 by letter(s) or number." Under the Sharbonos' theory, all named insureds on the general declaration page would be covered under each coverage within the policy. And this is not only inconsistent with the above language, it violates the structure and overriding theme of the policy; a commercial garage policy that affords limited coverage to various persons and business entities associated with the garages as owners, employees, lenders, and lessors, with some limited coverage for the Sharbonos' personal use of a vehicle the business owned.[6]
¶ 38 Moreover, we find no ambiguity in the policy that would mislead the average insurance purchaser. The definition of "You," as the Sharbonos point out, means those persons shown in the declarations. But it does not follow that all coverages thereby insure all named insureds. The limiting language says just the opposite. We conclude that an average insurance purchaser would recognize Universal's clear intent to provide its different coverages only to those named insureds designated either by number or letter in the specific coverage.
¶ 39 The trial court erred in determining that Umbrella Coverage Part 980 in both the All Transmission & Automotive and The Trans-Plant insurance policies obligated Universal to indemnify James and Deborah Sharbono for losses arising out of Cassandra's automobile accident. As a matter of law, Umbrella Coverage Part 980 does not apply to the Tomyns' claims against the Sharbonos. We reverse the trial court's summary judgment declaring that Universal's Umbrella Coverage Part 980 applies to the Sharbonos' liability for Cassandra's accident with Cynthia Tomyn. We also reverse the trial court's ruling permitting the Sharbonos to stack the two coverage parts to provide an additional $6,000,000 in available coverage.

III. REASONABLENESS OF THE TOMYN-SHARBONO SETTLEMENT
¶ 40 Universal argues that the trial court erred in ruling that the Tomyn-Sharbono settlement for $4,525,000 was reasonable. Universal argues that the "settlement amount was driven more by what insurance coverage the Tomyns and Sharbonos claimed was potentially available than the actual value of the Tomyn claim." Br. of Appellant at 44. Universal maintains that the "Sharbonos *416 settled for an inflated amount to escape exposure." Br. of Appellant at 48.
¶ 41 At trial, the Sharbonos bore the burden of proving the settlement's reasonableness. RCW 4.22.060(1). We will uphold the trial court's factual determination of a settlement's reasonableness if substantial evidence supports that determination. Brewer v. Fibreboard Corp., 127 Wash.2d 512, 524, 901 P.2d 297 (1995) (citing Glover v. Tacoma Gen. Hosp., 98 Wash.2d 708, 718, 658 P.2d 1230 (1983)). Substantial evidence is evidence that would persuade a fair-minded person of the asserted statement's truth. Reg'l Transit Auth. v. Miller, 156 Wash.2d 403, 419, 128 P.3d 588 (2006) (quoting State v. Hill, 123 Wash.2d 641, 644, 870 P.2d 313 (1994)).
¶ 42 Where an insured negotiates a settlement and seeks reimbursement, the insurer is liable only for the amount of the settlement that is reasonable and paid in good faith. Besel v. Viking Ins. Co., 146 Wash.2d 730, 738, 49 P.3d 887 (2002) (citing Evans v. Cont'l Cas. Co., 40 Wash.2d 614, 628, 245 P.2d 470 (1952)). To determine a settlement's reasonableness in the context of a consent judgment and covenant not to execute, the court considers:
[1] [T]he releasing person's damages; [2] the merits of the releasing person's liability theory; [3] the merits of the released person's defense theory; [4] the released person's relative faults; [5] the risks and expenses of continued litigation; [6] the released person's ability to pay; [7] any evidence of bad faith, collusion, or fraud; [8] the extent of the releasing person's investigation and preparation of the case; and [9] the interests of the parties not being released.
Chaussee v. Maryland Cas. Co., 60 Wash. App. 504, 512, 803 P.2d 1339 (1991) (quoting Glover, 98 Wash.2d at 717, 658 P.2d 1230). Ensuring reasonable settlements protects insurers from liability for excessive judgments. Besel, 146 Wash.2d at 737-38, 49 P.3d 887 ("Because a covenant not to execute raises the specter of collusive or fraudulent settlements, the limitation on an insurer's liability for settlement amounts is all the more important. A carrier is liable only for reasonable settlements that are paid in good faith."). "No one factor controls and the trial court has the discretion to weigh each case individually." Chaussee, 60 Wash.App. at 512, 803 P.2d 1339 (citing Glover, 98 Wash.2d at 717, 658 P.2d 1230).
¶ 43 Although the Sharbonos claim that the trial court addressed each Chaussee/Glover factor in making its determination, the record does not contain the pertinent Report of Proceedings. And the trial court's order merely stated that the court reviewed the files and records before ruling on the settlement's reasonableness.[7] Accordingly, the trial court's considerations in weighing the factors are unclear. But the record contains enough evidence to support the court's conclusion that the settlement was reasonable. See Glover, 98 Wash.2d at 718, 658 P.2d 1230, overruled on other grounds by Crown Controls, Inc. v. Smiley, 110 Wash.2d 695, 756 P.2d 717 (1988).
A. The Chaussee/Glover Factors
¶ 44 Universal focuses on the trial court's alleged failure to consider (1) the Tomyns' damages, (2) the merits of the Sharbonos' defense, (3) the risks and expenses of continued litigation, (4) the Sharbonos' ability to pay, and (5) any evidence of bad faith, collusion, or fraud. We address only the factors that Universal claims the trial court failed to properly consider. See Besel, 146 Wash.2d at 739 n. 2, 49 P.3d 887 (all nine criteria are not necessarily relevant in every case).
1. The Tomyns' Damages
¶ 45 Universal admits that the Tomyns "certainly experienced significant damages," but it argues that the Sharbonos' economist inflated the economic impact of Cynthia Tomyn's death by assuming, without any evidence, that Cynthia would have started working full time in September 2002. Supp. Br. of Appellant at 6-7. Universal also complains *417 that the analysis erroneously applied a man's, rather than a woman's, work life expectancy.[8]
¶ 46 The Sharbonos submitted evidence that Cynthia was 33 years old, that she had been married to her husband for 15 years, that they had 3 children, and that the Tomyns were a very close family. They also submitted a guardian ad litem's evaluations of the three children's emotional distress resulting from Cynthia's death.
¶ 47 To show the economic effect of Cynthia's death, the Sharbonos offered an economist's report estimating the economic loss to the Tomyns at $1,050,228. The economist reached that figure using a 33-year-old female with equivalent education, life expectancy, work life expectancy, and income. The report discounted from that income the average personal consumption of a similarly situated person. The report included in its damages calculation certain "nonmarket services" such as house and yard work, child care, cooking, and marketing. CP at 544.
¶ 48 Universal disputed the economist's report's accuracy but offered no conflicting evidence.
2. The Merits of the Sharbonos' Defense
¶ 49 Universal argues that the Sharbonos had a legitimate defense theory because both Cassandra and her passenger testified that a vehicle in front of them lost control in the adverse weather and road conditions, causing vehicles to stop in front of them and creating an emergency situation.
¶ 50 The Sharbonos submitted a letter from James La Porte  defense counsel that State Farm appointed to defend the Sharbonos  to State Farm stating that "I do not have any delusions that [the Sharbonos] will be successful in avoiding a liability ruling. . . . The remaining issue is whether any third party entities contributed; and as indicated above and previously, that remains to be seen but it is very questionable." CP at 565-56.
¶ 51 The police cited Cassandra for second degree negligent driving. Additionally, a trial court had previously entered summary judgment regarding the Sharbonos' liability. Indeed, the Sharbonos admitted that Cassandra "was at least partially at fault" for the accident. CP at 557. The Sharbonos only hope was that the court would apportion fault, not absolve them of it.
¶ 52 Aside from its assertion that the Sharbonos may have had a defense based on an "emergency situation," Universal presented no authority or legal analysis supporting its argument that the Sharbonos had defenses to liability. Universal fails to show that the Sharbonos had viable defenses that could have mitigated the settlement value of the Tomyns' claims.
3. The Risks and Expenses of Continued Litigation
¶ 53 Universal maintains that "[a]lthough the Sharbonos certainly faced the possibility of liability, their exposure was not as great as they portrayed it to be." Br. of Appellant at 45-46.
¶ 54 Universal argues that the Sharbonos had no litigation expenses because State Farm provided them a defense without a reservation of rights. Although State Farm hired counsel to represent the Sharbonos, it also told the Sharbonos that "because the amount claimed against [them] . . . is in excess of the protection afforded by [the State Farm] policy, there may be a personal liability for damages on [the Sharbonos'] part." Exhibit 39. Accordingly, State Farm recommended that the Sharbonos hire an attorney, at their own expense, to represent them for any personal exposure beyond the State Farm policy limits. And the Sharbonos incurred litigation expenses in working toward a settlement and then pursuing the coverage claims against Universal as the settlement required.[9] Thus, until the Sharbonos settled *418 with the Tomyns, they faced continuing litigation with the Tomyns with a substantial exposure above their State Farm limits of $250,000 and the $1,000,000 umbrella coverage that Universal conceded.
¶ 55 Correspondence between the Tomyns and Sharbonos reflects this expense and exposure. For instance, several letters show that the Sharbonos believed that they would have to file for bankruptcy if the Tomyns pursued litigation. And attorneys for both the Tomyns and Sharbonos repeatedly acknowledged that the Sharbonos faced a reasonable risk of a jury rendering a substantial judgment against them.
¶ 56 Moreover, the Sharbonos presented jury verdict research that supported the settlement amount. Universal takes exception to the representative jury verdicts the Sharbonos supplied and argued below that the jury verdicts it supplied were more instructive. Universal takes particular issue with the Sharbonos' reliance on Joyce v. Dep't of Corr., 155 Wash.2d 306, 119 P.3d 825 (2005), as a representative verdict justifying the settlement amount. Before the trial court, Universal argued that Joyce involved very different and unusual circumstances.
¶ 57 In Joyce, the plaintiff recovered a $22,453,645 judgment against the Department of Corrections for its negligence in allowing a psychotic felon under community placement to repeatedly violate his probation conditions without taking action. Joyce v. Dep't of Corr., 116 Wash.App. 569, 586, 75 P.3d 548 (2003), rev'd in part by Joyce, 155 Wash.2d at 326, 119 P.3d 825. Eventually, the felon stole a vehicle in Seattle and sped down the freeway to Tacoma, where he drove 60 to 70 miles per hour through a residential area, ignoring traffic signs and lights, and struck Mrs. Joyce's vehicle and killed her. Joyce, 155 Wash.2d at 314, 119 P.3d 825. Universal argues that the $22,435,645 judgment recovered under the anomalous facts of the case skewed the trial court's evaluation of the risk the Sharbonos faced. Although the Joyce verdict was admittedly large, it did not necessarily skew the trial court's evaluation of the Sharbonos' exposure. Even experienced trial attorneys cannot predict with any degree of certainty the amount a jury will award in these cases. And the lesson of Joyce is that a defendant must consider the full range of possible verdicts in negotiating a reasonable settlement.
¶ 58 In addition to Joyce, the Sharbonos submitted representative verdicts and settlements ranging from $450,000 to $4,742,867, with an average plaintiff's award of $2,036,936.84. The representative verdicts and settlements that Universal submitted ranged from defense verdicts to $2,750,000, with an average plaintiff's award of $742,162.26. We are satisfied that the submitted jury verdict ranges support the trial court's finding that the settlement amount was reasonable.
4. The Sharbonos' Ability to Pay
¶ 59 Universal argues that, although the Sharbonos claimed they could not afford to pay a personal judgment in the millions and that a trial would have forced them into bankruptcy, the Sharbonos in fact had considerable personal assets. Universal's argument misses the point. The Sharbonos documented their personal assets when they moved for an order finding the proposed settlement reasonable. The Sharbonos also provided copies of correspondence with their attorneys, and between their attorneys and the Tomyns' attorneys, establishing their limited ability to pay a judgment in excess of their liability coverage. The record supports the Sharbonos' belief that a verdict for the Tomyns in excess of the Sharbonos' liability coverage would likely force the Sharbonos into bankruptcy.
5. Evidence of Bad Faith, Collusion, or Fraud
¶ 60 Universal stated below that "[a]s the term is commonly defined, Universal does not allege any specific fraudulent activity in the settlement . . . [t]he attorneys for the Tomyns and the Sharbonos engaged in settlement discussions, which resulted in the eventual consent judgment and covenant not to execute." CP at 639. Still, Universal argues that the Tomyns' knowledge about *419 the amount of undisputed coverage ($1,250,000) and the disputed $3,000,000 in excess coverage lends a "collusive air" to the settlement that suggests an inflated settlement.
¶ 61 Correspondence between the Sharbonos' and Tomyns' attorneys demonstrates a good faith settlement negotiated at arm's-length. At one point, the Tomyns' attorneys demanded that the Sharbonos proceed with negotiations in good faith rather than "perpetually changing terms" of their proposed settlement to better their position. CP at 614. The Tomyns' attorneys initially suggested submitting the proposed settlement to arbitration but later repeatedly threatened to proceed with litigation when the Sharbonos failed to agree with proposed settlement offers.
¶ 62 Universal also argues that "[t]he strongest evidence . . . of the collusive relationship between the Tomyns and the Sharbonos is the fact that the Sharbonos negotiated a share of the settlement proceeds." Supp. Br. of Appellant at 8. But the Sharbonos did not negotiate a share of the $4,525,000 settlement. Rather, they reserved the right to "assert claims against . . . Universal as [the Sharbonos] deem prudent" and to "retain unto themselves all right of recovery from such claims," presumably referring to the Sharbonos' bad faith claim against Universal. CP at 492. And the Sharbonos' bad faith claim did not share any element of damages with the Tomyns' claims. We disagree with Universal that the Sharbonos negotiated a share of any proceeds the Tomyns might receive from Universal.
¶ 63 Furthermore, Universal is mistaken that the Tomyns and Sharbonos settled for the highest amount of insurance the Sharbonos could recover because the Sharbonos had two $3,000,000 umbrellas, and the trial court determined, albeit erroneously, that Universal was potentially liable to the Sharbonos for up to $7,000,000.
¶ 64 Universal's bare allegation that the Sharbonos and Tomyns engaged in collusive negotiations fails.
B. The Court's Determination on the Settlement's Reasonableness
¶ 65 Although the record does not conclusively establish that the trial court explicitly considered the nine Chaussee/Glover factors, sufficient evidence supports the court's conclusion that the settlement was reasonable. See Glover, 98 Wash.2d at 718, 658 P.2d 1230. The Sharbonos presented substantial evidence of each of the nine Chaussee/Glover factors. And we are not willing to speculate that the trial court ignored the extensive briefing and argument from both parties and found the settlement reasonable on some basis other than the Chaussee/Glover factors. In any event, as we have discussed, the record amply supports the court's finding of reasonableness.
¶ 66 Universal also argues that the Sharbonos failed to give Universal the statutorily required notice of their settlement with the Tomyns. This argument is without merit because RCW 4.22.060(1) requires that all parties receive notice of the settlement. Universal was not a party to the lawsuit between the Tomyns and Sharbonos. Universal admits as much in its brief to the trial court regarding the settlement's reasonableness.

IV. BAD FAITH AND CONSUMER PROTECTION ACT CLAIMS
A. Bad Faith
¶ 67 Universal contends that the trial court erred when it determined, as a matter of law, that it was liable for bad faith. Universal asserts that, to prove bad faith, the insured must demonstrate that the insurer unreasonably, frivolously, and without foundation, breached its contract with the insured. Thus, argues Universal, whether the insurer's conduct amounted to bad faith is ordinarily a question of fact. The Sharbonos argue that Universal exercised bad faith, as a matter of law, when it failed to assist them in settling with the Tomyns by disclosing information that could have helped in the negotiations.
¶ 68 The Sharbonos presented the following facts in their summary judgment motion. The Sharbonos retained Maureen Falecki as private counsel after a dispute arose about the amount of the Sharbonos' umbrella coverage *420 with Universal. When the Sharbonos began settlement negotiations with the Tomyns, they believed they had $3,000,000 in personal liability umbrella coverage from Universal. Universal stated that the Sharbonos' claim that they had three separate $1,000,000 personal umbrella policies made "no logical sense as the personal exposure covered by a Personal Umbrella is unrelated to the business exposure covered by the commercial policies." CP at 977. Universal admitted that the Sharbonos' commercial umbrella had a $3,000,000 coverage limit, but it argued that the coverage did not apply to claims from Cassandra's accident.
¶ 69 Falecki, on the Sharbonos' behalf, asked Universal to provide the complete underwriting files for the Sharbonos' three insurance policies so that she could determine how much personal umbrella coverage the Sharbonos had. Universal repeatedly refused to provide the underwriting files, stating that they contained proprietary information and that it was "not aware of any authority that [would] give [the Sharbonos] access to those records." CP at 977, 982.
¶ 70 Falecki responded that while she did not know of any specific legal authority requiring Universal to produce the underwriting files, there was "a genuine and bona[ ]fide dispute over the amount of coverage [that Universal's agent] represented he would provide the Sharbonos via the umbrella policies." CP at 984. Falecki informed Universal that the Sharbonos believed they had an additional $2,000,000 personal umbrella policy with Universal, but Universal records showed that the $2,000,000 personal umbrella policy was canceled less than three weeks before the fatal accident. The Sharbonos claimed that they did not authorize cancellation of the $2,000,000 personal umbrella policy. Accordingly, Falecki asked for all documents relating to the cancellation of the $2,000,000 policy and again asked for the complete underwriting files for the Sharbonos' insurance policies.
¶ 71 Universal denied that the $2,000,000 policy had been cancelled, stating that it had amended the personal umbrella policies at the insureds' request to provide three separate $1,000,000 policies, one under each commercial policy and intended to cover three separate owners.[10] Universal explained in detail to the Sharbonos why it believed that the Sharbonos were eligible for only $1,000,000 in coverage. Universal submitted three separate personal umbrella applications to support its position. Universal again refused the Sharbonos' request for the production of its underwriting files related to their policies.
¶ 72 After a second failed mediation, Falecki informed Universal that the mediation failed, in part, because of the unresolved coverage issues. At the second mediation, the Sharbonos requested Universal's underwriting files from Glenn Reid, a Universal representative present at the mediation. Reid rejected the request.
¶ 73 In a letter to Universal following the failed mediation, Falecki again asked for the underwriting files. Falecki stated that the requested records were directly relevant to the action because the Sharbonos needed them to analyze the facts surrounding their coverage, the Tomyn children's guardians ad litem needed them before they could recommend that the court approve any proposed settlement, and both parties needed them to settle the case. In the same letter, Falecki told Universal that if it failed to cooperate, the Sharbonos would assert bad faith claims against Universal. Universal again refused to produce the files, stating that the Sharbonos had not provided any authority to support their request; Universal also said that if the Sharbonos sued, it would counterclaim for abuse of process.
¶ 74 The Tomyns then joined the fray, threatening to sue Universal unless it cooperated. The Tomyns explained that they had not yet sued the Sharbonos because they wanted to resolve the matter amicably and in good faith but that Universal's "intransigence *421 in providing the information that will obviously be required to be produced through litigation discovery[] will only serve to prejudice [its] insureds and expose their personal assets." CP at 1005. Universal again refused to produce the requested files. The Tomyns then sued the Sharbonos.
¶ 75 In their summary judgment motion, the Sharbonos argued that Universal acted in bad faith and violated Washington's CPA[11] when, among other things, it refused to assist them in determining how much coverage they had by providing the underwriting file. The trial court agreed and ruled that Universal's refusal to assist the Sharbonos in settling by providing its underwriting files amounted to bad faith as a matter of law.
¶ 76 Whether an insurer acted in bad faith is generally a question of fact. Smith v. Safeco Ins. Co., 150 Wash.2d 478, 484, 78 P.3d 1274 (2003) (citing Van Noy v. State Farm Mut. Auto. Ins. Co., 142 Wash.2d 784, 796, 16 P.3d 574 (2001)). But a trial court may determine a factual question as a matter of law if reasonable minds could reach but one conclusion. Smith, 150 Wash.2d at 485, 78 P.3d 1274 (citing Ruff v. County of King, 125 Wash.2d 697, 703-04, 887 P.2d 886 (1995)). Thus, the issue is whether Universal established a material issue of fact sufficient to defeat summary judgment.
¶ 77 Insurers owe a statutory duty of good faith to their insureds. RCW 48.01.030. An insurer may breach its broad duty to act in good faith by conduct short of intentional bad faith or fraud, although not by a good faith mistake. Anderson v. State Farm Mut. Ins. Co., 101 Wash.App. 323, 329, 2 P.3d 1029 (2000) (citing Coventry Assocs. v. Am. States Ins. Co., 136 Wash.2d 269, 280, 961 P.2d 933 (1998) and Industrial Indem. Co. of the N.W., Inc. v. Kallevig, 114 Wash.2d 907, 916-917, 792 P.2d 520 (1990)). An insurer must give equal consideration to its policyholder's interests as well as its own. Am. States Ins. Co. v. Symes of Silverdale, Inc., 150 Wash.2d 462, 470, 78 P.3d 1266 (2003) (quoting Van Noy, 142 Wash.2d at 793, 16 P.3d 574). The question in bad faith claims is always whether the insurer acted reasonably under the facts and circumstances of the case. Kallevig, 114 Wash.2d at 920, 792 P.2d 520. Here, the trial court determined that Universal did not establish a genuine issue of material fact regarding whether it "failed to give equal consideration to the interests of its insureds, or that its actions were not frivolous, unfounded or unreasonable." CP at 2176.
¶ 78 Universal argues that it correctly and reasonably withheld its proprietary underwriting files either because CR 26(b)(2) did not obligate it to produce the files or because Universal had a reasonable basis for believing CR 26 did not require it to do so. Universal cites our commissioner's ruling, on discretionary review, that the trial court in the Tomyn-Sharbono lawsuit committed probable error in ordering Universal to produce its underwriting files relevant to the Sharbonos' insurance policies. But Universal misinterprets our commissioner's narrow holding. The issue here is whether the duty of good faith required Universal to disclose its underwriting files to its insured. The issue the commissioner addressed was whether CR 26(b)(2) required Universal to disclose an underwriting file to a person suing one of its insureds in a personal injury lawsuit. The commissioner's ruling and CR 26 have no bearing on the instant case. Cf. Smith v. Safeco Ins. Co., 112 Wash.App. 645, 652 n. 31, 50 P.3d 277 (2002), (CR 26(b)(2) applies to disclosure of policy limits only after a lawsuit is filed), rev'd on other grounds, 150 Wash.2d 478, 78 P.3d 1274 (2003).
¶ 79 Universal also argues that it did not act in bad faith because the Sharbonos did not articulate reasons for requesting the underwriting files. This argument is disingenuous given that Falecki advised Universal that the Sharbonos believed they had applied for an additional $2,000,000 personal umbrella; the Sharbonos needed the files to analyze the facts surrounding their coverage; the Tomyn children's guardians ad litem needed the files to evaluate any proposed settlement; and both parties needed them to effect a settlement. And while the Sharbonos admittedly *422 failed to provide any legal authority explicitly stating that an insurer has an obligation to produce underwriting files related to the insured's policies, insurers owe a general duty of good faith to their insureds due to the fiduciary relationship insurers and insureds share. See Coventry, 136 Wash.2d at 280, 961 P.2d 933; Truck Ins. Exch. v. VanPort Homes, Inc., 147 Wash.2d 751, 765, 58 P.3d 276 (2002).
¶ 80 Here, the Sharbonos believed they had applied for and purchased more than a single $1,000,000 personal umbrella policy. They expressed their concerns to Universal and stated that they could not settle the Tomyns' claims without the underwriting information. Under these circumstances, Universal had to do more than simply assert that the Sharbonos needed to provide legal authority for their request.
¶ 81 But Universal maintains that "[u]nderwriting files can often contain information reflecting an insurer's procedures used to evaluate risks, a vital internal business practice." Reply Br. of Appellant at 26. Universal argues that "[d]isclosure of such information would put the insurer at a commercial disadvantage." Reply Br. of Appellant at 26. The argument is plausible and fits with Universal's explanation to the Sharbonos that the underwriting file contained proprietary information. But Universal fails to point to a single document in the underwriting file that contains sensitive information or information that could have impacted its business interests. Additionally, during the proceedings below, Universal produced the entire underwriting file without seeking protection for any document in the file and offered the entire file into evidence. Thus, Universal failed to show that it had some interest in particular documents or information that outweighed the Sharbonos' benefits from disclosure. See Coventry, 136 Wash.2d at 280, 961 P.2d 933 (an insurer acts in bad faith when it overemphasizes its own interests).
¶ 82 Universal also argues that "[e]ven if this [c]ourt were to find Universal's conduct to be unreasonable and unfounded, it was not the cause of any harm to its insureds." Br. of Appellant at 54 (citing Anderson, 101 Wash.App. at 334-35, 2 P.3d 1029). But the Sharbonos did not move for summary judgment on the issue of damages. Rather, the Sharbonos sought judgment only on whether Universal's actions constituted bad faith, reserving for the jury the determination of damages. The jury ultimately decided that Universal's actions caused the Sharbonos significant economic and non-economic damages. Universal does not argue that substantial evidence did not support those decisions. Nor could it, since the record contains substantial evidence that Universal's conduct harmed the Sharbonos. The Tomyns' attorney testified that Universal's refusal to produce the underwriting file delayed the Tomyns' ability to determine the amount of insurance available to the Sharbonos, thus "making it impossible to resolve the claim." Report of Proceedings (RP) at 869-70.
¶ 83 In Smith v. Safeco Insurance Co., we held that "[i]n the absence of a statute or rule requiring disclosure . . . the insurer must disclose the insured's policy limits if a reasonable person in the same or similar circumstances would believe that disclosure is in the insured's . . . best interests." Smith, 112 Wash.App. at 653, 50 P.3d 277. Although the Smith court addressed a claimant's request, as opposed to an insured's, the court's underlying rationale supports the Sharbonos' position. Based on the Sharbonos' repeated requests for the underwriting file, together with their reasons for needing the documents, a reasonable person could only conclude that disclosure was in the Sharbonos' best interest. And more importantly, Universal failed to demonstrate any significant need to protect the contents of its underwriting files and that such need weighed as heavily as the Sharbonos' interests. See Coventry, 136 Wash.2d at 280, 961 P.2d 933. The trial court did not err in granting the Sharbonos summary judgment on their claim that Universal acted in bad faith.
B. Consumer Protection Act
¶ 84 The Sharbonos argue that the trial court did not err in ruling that Universal violated WAC 284-30-330(7). Universal concedes that insureds have a cause of action *423 under the CPA when insurers breach their duty to act in good faith. But Universal maintains that it did not violate WAC 284-30-330(7) and that, in any event, whether it violated that regulation is a question of fact that the court should not have decided on summary judgment.
¶ 85 An insurer commits a per se violation of the CPA when the insurer violates a statute that contains a specific legislative declaration of public interest impact. Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co., 105 Wash.2d 778, 791, 719 P.2d 531 (1986) (citing Haner v. Quincy Farm Chems., Inc., 97 Wash.2d 753, 762, 649 P.2d 828 (1982)); Salois v. Mut. of Omaha Ins. Co., 90 Wash.2d 355, 358-59, 581 P.2d 1349 (1978). A violation of WAC 284-30-330(7) is a per se violation of the CPA. See WAC 284-30-330 (the provisions within WAC 284-30-330 are unfair or deceptive acts or practices in the business of insurance) and RCW 48.01.030 (the business of insurance is one affected by the public interest); see also Hangman Ridge, 105 Wash.2d at 786, 719 P.2d 531 (when the legislature says that a violation of a particular statute constitutes an unfair or deceptive act in trade or commerce, violation of that statute is a per se CPA violation).
¶ 86 Contrary to the Sharbonos' assertion  and the trial court's summary judgment ruling  WAC 284-30-330(7) does not apply here. That regulation provides as follows:
The following are hereby defined as unfair methods of competition and unfair or deceptive acts or practices in the business of insurance, specifically applicable to the settlement of claims:
. . .
(7) Compelling insureds to institute or submit to litigation, arbitration, or appraisal to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in such actions or proceedings.
WAC 284-30-330(7).
¶ 87 First, Universal did not compel the Sharbonos to submit to litigation, arbitration, or appraisal to recover any amount of money by offering substantially less than the amount the Sharbonos ultimately recovered. As we have discussed, the Sharbonos are entitled to only the $1,000,000 from Personal Umbrella Coverage Part 970, not the additional coverage amounts in Umbrella Coverage Part 980. Because WAC 284-30-330(7) does not apply, the trial court erred in granting summary judgment on the Sharbonos' CPA claim and in awarding the Sharbonos treble damages.
¶ 88 But even if an insured cannot prove a per se violation of the CPA, the insured may still recover for a CPA violation if the insured can show that the insurer (1) engaged in an unfair or deceptive act or practice (2) in trade or commerce, and (3) that the act or practice affects the public interest. Hangman Ridge, 105 Wash.2d at 784, 719 P.2d 531 (citing Anhold v. Daniels, 94 Wash.2d 40, 614 P.2d 184 (1980)). The insured must also prove (4) a resulting damage to the insured's business or property, and (5) that a causal link exists between the unfair or deceptive act and the injury suffered. Hangman Ridge, 105 Wash.2d at 784-85, 719 P.2d 531.
¶ 89 The trial court's error in granting summary judgment on Universal's alleged violation of WAC 284-30-330(7) requires that we vacate the bad faith judgment. The trial court instructed the jury that it could consider Universal's CPA violation in awarding damages. Yet the jury verdict form did not ask the jury to apportion damages between bad faith and the CPA violation. Accordingly, we do not know what amount the jury awarded as CPA damages. But because the Sharbonos' complaint does not limit their CPA claim to Universal's alleged violation of WAC 284-30-330(7), on remand they may attempt to show that Universal violated the CPA by establishing the five elements enunciated in Hangman Ridge, 105 Wash.2d at 784-85, 719 P.2d 531.
¶ 90 In the following, we discuss only those issues likely to arise on retrial.

V. ALLEGED TRIAL ERRORS
A. Commissioner Skerlec's Ruling
¶ 91 Universal contends the trial court erred in not allowing it to introduce *424 evidence that our commissioner granted discretionary review of the trial court's ruling compelling Universal to produce its underwriting file in the Tomyn-Sharbono action. At trial, the Sharbonos introduced evidence that the trial court had ordered Universal to produce the underwriting files. Universal wanted to introduce the grant of discretionary review to let the jury know that the trial court probably erred in doing so.
¶ 92 The grant of discretionary review is of minimal, if any, relevance. The trial court had already ruled as a matter of law that Universal committed bad faith. The only issue for the jury was whether Universal's bad faith conduct damaged the Sharbonos. The commissioner's ruling had nothing to do with that issue.
B. Mediation Evidence
¶ 93 Universal argues that the trial court erred when it permitted the Sharbonos, Falecki, and Barcus, the Tomyns' attorney, to describe what happened at the two mediations. Universal argues that the Sharbonos used the mediation evidence to establish Universal's liability. Universal maintains that RCW 5.60.070(1) and ER 408 prohibit the court from allowing the allegedly objectionable testimony.
¶ 94 Universal takes particular issue with testimony regarding the impact that a videotape of Cynthia Tomyn's family discussing her death had on the Sharbonos. At trial, Falecki testified that the Tomyns' attorney played the videotape during the mediation. In the film, the Tomyns talked about the loss of Cynthia and its effect on them. Falecki testified that the tape had "a very emotional impact" on the Sharbonos and that she could "see that they were very taken by everything that was said in the video." RP at 708. The trial court overruled defense counsel's relevancy objection. Barcus also testified that the Sharbonos "appeared to be emotional" when he played the video. RP at 779.
¶ 95 Universal also argues that the trial court violated RCW 5.60.070 by allowing James Sharbono and Falecki to testify that Glenn Reid, the Universal representative at the mediations, told the parties that the Sharbonos would have to sue Universal to obtain the file.
¶ 96 At trial, James Sharbono twice testified that Reid said that the only way the Sharbonos would get the underwriting files was to sue Universal. Falecki also testified that Reid said she would have to sue to get Universal's underwriting files. The Sharbonos' counsel argued that he elicited that testimony to show the Sharbonos' understanding of Universal's position. The court apparently agreed with counsel. Finally, when asked about her feelings at that mediation, Deborah Sharbono testified that she was shocked when Reid said that the Sharbonos would have to sue to obtain the underwriting files. She said she felt that Universal was "hiding things." RP at 1127.
¶ 97 RCW 5.60.070(1) states that
If there is a court order to mediate, a written agreement between the parties to mediate, or if mediation is mandated under RCW 7.70.100, then any communication made or materials submitted in, or in connection with, the mediation proceeding, whether made or submitted to or by the mediator, a mediation organization, a party, or any person present, are privileged and confidential and are not subject to disclosure in any judicial or administrative proceeding[.]
The statute also contains several exceptions to this exclusionary rule, none of which applies here. See RCW 5.60.070(1)(a)-(g).
¶ 98 Universal fails to provide any evidence establishing that the mediation was a result of a court order, a written agreement between the parties, or a mandate under RCW 7.70.100. See RCW 5.60.070(1). Universal argues that "[t]here is no record of a written agreement between the parties or a court order in this case because the Sharbonos raise this contention for the first time on appeal in violation of RAP 2.5(a)." Reply Br. of Appellant at 33 n. 13. But the Sharbonos would have had no reason to raise this argument until now, when Universal first argued that RCW 5.60.070(1) compels exclusion of the testimony. Further, Universal bears the burden on appeal of establishing that the court abused its discretion by failing to apply RCW 5.60.070(1). See Guillen v. Pierce *425 County, 144 Wash.2d 696, 716, 31 P.3d 628 (2001) (the burden of showing that a privilege applies in any given situation rests entirely upon the party asserting the privilege), rev'd in part, Pierce County v. Guillen, 537 U.S. 129, 123 S.Ct. 720, 154 L.Ed.2d 610 (2003). Thus, Universal had the obligation to produce a court order, written agreement, or mandate. It did not.
¶ 99 ER 408 states, in relevant part:
Evidence of conduct or statements made in compromise negotiations is . . . not admissible [to prove liability for or invalidity of the claim or its amount]. This rule does not require exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness [or] negating a contention of undue delay[.]
The comment to former ER 408 (2006) states that the rule's final sentence is consistent with previous Washington law admitting evidence of compromise and offers of compromise when offered for some purpose other than liability. Former ER 408, cmts. (2006) (citing Matteson v. Ziebarth, 40 Wash.2d 286, 242 P.2d 1025 (1952) (to prove lack of good faith where good faith in issue)).
¶ 100 Here, the trial court found Universal liable. The issue at trial was whether Universal's bad faith damaged the Sharbonos and, if so, in what amount. The Sharbonos presented the mediation evidence to show the importance of Universal's underwriting file and the harm that Universal's refusal to produce the file cause the Sharbonos. The court admitted the mediation testimony as evidence of the Sharbonos' state of mind during the time they attempted to obtain the underwriting files from Universal. Because the trial court admitted the testimony for purposes other than liability, the trial court did not abuse its discretion.
C. Proximate Cause Instruction
¶ 101 Universal maintains that the court erred in giving the "substantial factor" proximate cause instruction. The trial court instructed the jury on proximate cause as follows: "The term `proximate cause' means a cause that was a substantial factor in bringing about the damages or injury even if the result would have occurred without it." CP at 2279. Universal objected to this instruction and offered instead the CPA proximate cause instruction in WPI 310.07 or, in the alternative, WPI 15.01.
¶ 102 In Daugert v. Pappas, 104 Wash.2d 254, 262, 704 P.2d 600 (1985), our Supreme Court stated that the substantial factor test for determining proximate cause "is normally justified only when a plaintiff is unable to show that one event alone was the cause of the injury." The court noted that the substantial factor test is appropriate in three types of cases:
First, the test is used where either one of two causes would have produced the identical harm, thus making it impossible for plaintiff to prove the "but for" test. In such cases, it is quite clear that each cause has played so important a part in producing the result that responsibility should be imposed on it. Second, the test is used where a similar, but not identical, result would have followed without the defendant's act. Third, the test is used where one defendant has made a clearly proven but quite insignificant contribution to the result, as where he throws a lighted match into a forest fire.
Daugert, 104 Wash.2d at 262, 704 P.2d 600 (citing W. KEETON, D. DOBBS, R. KEETON & D. OWEN, PROSSER AND KEETON ON TORTS § 41 (5th ed.1984)).
¶ 103 Washington courts have adopted the substantial factor test in cases involving discrimination or unfair employment practices. See, e.g., Mackay v. Acorn Custom Cabinetry, 127 Wash.2d 302, 310, 898 P.2d 284 (1995) (gender discrimination); Wilmot v. Kaiser Alum. & Chem. Corp., 118 Wash.2d 46, 69-72, 821 P.2d 18 (1991) (retaliatory discharge for filing workers' compensation claim); Allison v. Hous. Auth., 118 Wash.2d 79, 95, 821 P.2d 34 (1991) (retaliatory discharge for filing an age discrimination complaint); City of Federal Way v. Pub. Employment Relations Comm'n, 93 Wash. App. 509, 513-14, 970 P.2d 752 (1998) (retaliation *426 for union organizing activity); Capers v. Bon Marche, 91 Wash.App. 138, 143-44, 955 P.2d 822 (1998) (racial discrimination). The substantial factor test is appropriate in these cases, where causation is difficult to prove, largely due to public policy considerations that strongly favor eradication of discrimination and unfair employment practices. See, e.g., Mackay, 127 Wash.2d at 309-10, 898 P.2d 284; Wilmot, 118 Wash.2d at 70, 821 P.2d 18; Allison, 118 Wash.2d at 94, 821 P.2d 34 (substantial factor test is based more on policy considerations than on the factual inquiry of the "but for" test).
¶ 104 Courts have also used a substantial factor test in securities cases. See, e.g., Hines v. Data Line Sys., Inc., 114 Wash.2d 127, 148-49, 787 P.2d 8 (1990); Haberman v. Wash. Pub. Power Supply Sys., 109 Wash.2d 107, 131-32, 744 P.2d 1032 (1987), 750 P.2d 254 (1988); Herrington v. David D. Hawthorne, CPA, P.S., 111 Wash.App. 824, 47 P.3d 567 (2002). But in these cases, the courts instructed on substantial factor to assist the jury in determining whether a defendant was liable as a "seller" under the Washington Securities Act, not to determine proximate cause in tort liability cases. See Haberman, 109 Wash.2d at 130-31, 744 P.2d 1032 (rejecting the "strict privity" approach to determining whether a defendant was a "seller" of securities in favor of the "substantial factor-proximate cause" analysis and attaching liability to any actor whose conduct is a "substantial contributive factor" in the sales transaction).
¶ 105 Courts have also used the substantial factor definition of proximate cause in toxic tort cases, including asbestos exposure cases. See, e.g., Hue v. Farmboy Spray Co., Inc., 127 Wash.2d 67, 91-92, 896 P.2d 682 (1995); Mavroudis v. Pittsburgh-Corning Corp., 86 Wash.App. 22, 32, 935 P.2d 684 (1997). In those cases, the substantial factor test was appropriate because two or more causes may have combined to cause an injury, and any one of them operating alone might not have caused the alleged injury. Hue, 127 Wash.2d at 91-92, 896 P.2d 682 (without expressly stating "substantial factor test," the court required the plaintiff to prove that an individual defendant used a pesticide that became part of the drifting pesticide cloud that caused plaintiff's damages); Mavroudis, 86 Wash.App. at 28, 935 P.2d 684 (plaintiff required to prove that exposure to a particular asbestos supplier's asbestos played a role in causing injuries suffered from multiple exposures to asbestos from multiple suppliers).
¶ 106 Finally, Washington courts have employed the substantial factor test for determining proximate cause in medical malpractice cases where the malpractice reduces a decedent's chance of survival. See, e.g., Herskovits v. Group Health Coop., 99 Wash.2d 609, 617, 664 P.2d 474 (1983). In Herskovits, the decedent's estate sued the defendant for failing to diagnose lung cancer that eventually caused the decedent's death approximately two years later. Herskovits, 99 Wash.2d at 611, 664 P.2d 474. The plaintiff submitted evidence that the defendant's failure to diagnose lung cancer when the decedent visited the defendant's health care provider reduced the decedent's chance of survival from 39 to 25 percent. Herskovits, 99 Wash.2d at 612, 664 P.2d 474. The court held that the substantial factor test is an appropriate method to determine proximate cause when the causation question requires the jury to consider not only what occurred but also what might have occurred. Herskovits, 99 Wash.2d at 616, 664 P.2d 474. The court explained that where a plaintiff demonstrates that the defendant's acts or omissions increase the risk of harm to the plaintiff, the evidence allows the jury to find that the increased risk was a substantial factor in causing the resulting harm. Herskovits, 99 Wash.2d at 616-17, 664 P.2d 474.
¶ 107 The Sharbonos claim that Universal's failure to disclose the requested files damaged them in that it delayed the settlement. This delay caused the Sharbonos significant emotional distress and caused them to lose two of their three businesses because "they lost all interest and . . . all ability . . . to continue on with their business [because they believed] that they were ultimately at the end going to lose it." RP at 1810. The question then was for the jury to decide whether it believed that Universal's actions proximately caused the Sharbonos' injuries.
*427 ¶ 108 Neither party presented evidence that two inseparable causes contributed to the delayed settlement. The Sharbonos claimed that Universal's failure to produce its underwriting file prevented the parties from settling at the mediations. Universal contended that nothing in its file would have affected the settlement negotiations. Thus, the Sharbonos did not face two causes, either of which would have caused the harm, making it impossible for them to prove "but for" causation; nor did they face a similar, but not identical result, without Universal's refusal to produce the documents; finally, no other defendant contributed in an insignificant way to the result. See Daugert, 104 Wash.2d at 262, 704 P.2d 600. We conclude that the trial court erred in giving the "substantial factor" instruction.

VI. CROSS-APPEAL
A. Sharbonos' Dismissed Causes of Action
¶ 109 The Sharbonos' complaint included causes of action against Len Van de Wege, Universal's agent, for negligence, negligent misrepresentation, and breach of fiduciary duty. After ruling that the Sharbonos had sufficient insurance to cover the settlement, the trial court dismissed these claims. The trial court erred in doing so. The Sharbonos' claims against Van de Wege are independent of their claims for coverage under Universal's umbrella policies. Moreover, we have now reversed the trial court's coverage decision. Accordingly, we reverse the dismissal of these claims and remand for further proceedings.
B. Attorney Fees
¶ 110 The trial court awarded the Sharbonos $203,585 in attorney fees under RCW 19.86.090 and Olympic Steamship Co., Inc. v. Centennial Ins. Co., 117 Wash.2d 37, 811 P.2d 673 (1991). The Sharbonos argue that the trial court erred in failing to calculate a lodestar figure and by ordering an award based on counsel's actual fees billed.
¶ 111 Because the trial court incorrectly decided the coverage and stacking issues, and erroneously determined that Universal violated the CPA (WAC 284-30-330(7)), we vacate the trial court's attorney fee award.

VII. ATTORNEY FEES ON APPEAL
¶ 112 Both parties request costs, including attorney fees, on appeal. The Sharbonos argue that "[r]easonable attorney's fees and costs are mandatory for prevailing plaintiffs." Br. of Respondent at 98-99.
¶ 113 RAP 18.1(a) allows us to award attorney fees and costs on appeal "[i]f applicable law grants to a party the right to recover reasonable attorney fees or expenses." The Sharbonos are correct that, in general, where a prevailing party is entitled to attorney fees below, they are entitled to attorney fees if they prevail on appeal. Richter v. Trimberger, 50 Wash.App. 780, 786, 750 P.2d 1279 (1988) (citing West Coast Stationary Eng'rs Welfare Fund v. City of Kennewick, 39 Wash.App. 466, 477, 694 P.2d 1101 (1985)). Although the Sharbonos prevail on the reasonableness of their settlement and on the trial court's determination that Universal acted in bad faith, Universal has prevailed on the coverage, stacking, and CPA issues. Because neither party totally prevailed on appeal, we decline to award attorney fees under RAP 18.1.
¶ 114 In conclusion, we affirm the trial court's rulings that the Tomyn-Sharbono settlement is reasonable and that Universal acted in bad faith, as a matter of law, when it refused to produce its underwriting files. We reverse the trial court's summary judgment ruling that Umbrella Coverage Part 980 provided personal liability coverage to the Sharbonos and the trial court's determination that Universal violated the CPA. We also reverse the trial court's summary judgment dismissal of the Sharbonos' negligence claims against Len Van de Wege. Finally, we vacate the damage award and remand for further proceedings.
BRIDGEWATER, P.J., and QUINN-BRINTNALL, J., concur.
NOTES
[1] The Sharbonos conceded below that they had no coverage under the Parkland Transmission policy because they were not named insureds in that policy. Thus, that policy is irrelevant for purposes of this appeal.
[2] Because Umbrella Coverage Part 980 is identical in both policies, we refer to that coverage part singular.
[3] The Sharbonos cite Farmers Ins. Group v. Johnson, 43 Wash.App. 39, 715 P.2d 144 (1986) for the proposition that "entrustment of a vehicle is use of the vehicle." Br. of Respondent at 31. Farmers is inapposite. The court in that case never stated that entrustment is a use. Rather, the case stands for the proposition that a claim based on negligent entrustment of a vehicle is not a separate and independent cause of an injury that precludes operation of an exclusionary provision relating to injuries caused by use of that vehicle. Farmers, 43 Wash.App. at 42-44, 715 P.2d 144.
[4] Compare the declarations section regarding Umbrella Coverage Part 970 in both policies that states that "02" is the only insured under Umbrella Coverage Part 970.
[5] "Auto," as defined in Umbrella Coverage Part 980, "means a land motor vehicle, trailer or semi-trailer, designed for travel on public roads and includes permanently attached equipment." CP at 119, 255. The truck involved in the accident is an auto under this definition.
[6] The insurance policies state that "insurance applies only to those insureds, security interests, and locations designated for each coverage as identified in [i]tem 2 by letter(s) or number." CP at 31. In the All-Transmission policy, for instance, item 2 includes the following insureds: All Transmission & Automotive, Shar Enterprises, Inc., All Automotive, Inc., James & Deborah Sharbono, and SAR Investments, Inc. Item 2 also lists the following security interests: The Leasing Company, Inc., Minolta Business Systems, J.D. Shotwell Co., First Community Bank (Lacey, WA), Lease Commercial, First Community Bank (Tacoma, WA), U.S. Bank of Washington, SFNB, and Keybank USA. The Trans-Plant policy similarly lists multiple insureds and security interests.
[7] The record contains the evidence and argument that the Sharbonos and Universal submitted to the trial court regarding this issue.
[8] The economic consultant reasoned that because "standard work life expectancies for women substantially understate a woman's lifetime ability to earn income and have a significant downward bias for women who are strongly attached to market work[,] . . . [he felt] that it [was] appropriate to use male work life expectancies to determine economic damages in personal injury cases involving both males and females." CP at 542
[9] The settlement agreement, however, limited the Sharbonos' personal contribution to a maximum of $50,000 for attorney fees in the actions they agreed to pursue against Universal.
[10] Universal claimed that the Sharbonos had a $1,000,000 personal umbrella on the All Transmission & Automotive policy, Clarence and Claudia Ray had a $1,000,000 personal umbrella on the Trans-Plant policy, and Robert and Debra Huke had a $1,000,000 personal umbrella on the Parkland Transmission policy.
[11] Chapter 19.86 RCW.